Filed 9/10/13  P. v. Mendez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JUAN MANUEL MENDEZ,<br><br>  Defendant and Appellant. | F063497<br><br>(Super. Ct. No. CRM009929)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, and Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Juan Manuel Mendez of conspiracy to commit murder (Pen. Code, §§ 182, subd. (a)(1), 187, subd. (a)),[1] and two counts of being an accessory after the fact (§ 32). The convictions resulted from an unprovoked attack by three Hispanic males who shot and murdered DeAngelo S., and shot and seriously wounded J.S., while the two sat near a basketball court in an apartment complex. The jury also found true the allegation that a principal personally used a firearm within the meaning of section 12022.53, subdivision (e) in conjunction with the conspiracy count. The evidence established that Mendez was not one of the shooters, but he drove the vehicle used to transport the shooters to and from the apartment complex.

Mendez primarily raises two contentions. First, he contends the prosecutor exercised his peremptory challenges in a discriminatory manner, in violation of the *Batson/Wheeler*[2] line of cases. Second, he asserts the conviction for conspiracy to commit murder must be reversed because the vagueness of the verdict form renders the verdict unreliable. Mendez attacks the verdict form from several fronts. We reject each of these arguments and affirm the judgment of conspiracy to commit murder. We agree with the People's concession, however, that one accessory count must be reversed, and the enhancement on the conspiracy count pursuant to section 186.22 must be stricken because it is prohibited by section 12022.53, subdivision (e)(2).

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d. 258 (*Wheeler*).

# FACTUAL AND PROCEDURAL SUMMARY

## *The Information*

The seconded amended information charged Mendez with the first degree murder of DeAngelo (§ 187, subd. (a)), the attempted murder of J.S. (§§ 664, 187, subd. (a)), and conspiracy to commit murder (§ 182, subd. (a), 187, subd. (a)). Each count also alleged two enhancements. The first enhancement alleged Mendez was a principal in the crime and at least one other principal personally used a firearm within the meaning of section 12022.53, subdivisions (d) and (e)(1). The second enhancement alleged the crime was committed for the benefit of a street gang within the meaning of section 186.22, subdivision (b)(5).

## *The Testimony*

There were few factual disputes in this case, none of which are relevant to the issues on appeal. Accordingly, only a brief summary of the facts is necessary.

On the night of the shooting, DeAngelo and J.S. were sitting on a bench in an apartment complex near a basketball court. They were approached by three armed Hispanic males. Shots were fired, resulting in the death of DeAngelo. J.S. survived, despite being shot twice. The prosecution presented evidence suggesting the shooting was gang related, although neither DeAngelo nor J.S. was a gang member.

A witness, who went to high school with Mendez, identified Mendez as the driver of the vehicle that transported the shooters to and from the apartment complex. Mendez was arrested that night and gave the police a statement admitting his involvement in the shooting. We will summarize Mendez's statement, which was played for the jury, to explain his defense and the basis for his claimed inability to identify the shooters.

Mendez initially claimed he did not know why he was being interrogated and that he was at home asleep at the time of the shootings (10:00 p.m. to 11:00 p.m.). He denied driving the vehicle used to transport the shooters that night. He denied being at the scene, even after being told a witness had identified him and the vehicle he was driving.

3.

A search of Mendez's home resulted in the discovery of the guns used in the shooting being found under Mendez's bed. Mendez's story quickly changed. Mendez said he received a call asking if he could give the caller a ride. The caller, whom Mendez stated he did not know, said that Fire had told him to call Mendez for a ride. Mendez knew Fire from a high school he attended for a short while.

Mendez picked up Fire, the caller, and a third man near a store. Fire first stated the three were going to a party, but then asked Mendez to stop at the apartment complex. When the three men exited the vehicle, they used their shirts to cover their faces, except for their eyes. Mendez waited about 10 minutes. He heard approximately five gunshots and then the three men came running out of the complex. They told Mendez to "just go, just go." Mendez drove to a park. The three men said there were two Black guys at the apartment complex. An argument started and shots were fired. The three men told Mendez to hide the guns—two pistols and a shotgun. Mendez claimed he did not know any of the three men except for Fire.

Mendez dropped off the three at the same store at which he had picked them up and then dropped off the guns at his house. After Mendez got home, a different friend called for a ride. Mendez did not want to take the truck because it had been used in the shooting, so he took his brother's car.

The prosecution contended Mendez was guilty as an aider and abettor to the murder of DeAngelo and the attempted murder of J.S., and that Mendez conspired with the shooters to commit the crime. Mendez argued he was merely giving a friend a ride and did not know the three men were going to shoot anyone that night. He acknowledged that his actions after the shooting would make him guilty of being an accessory after the fact, in violation of section 32, but asserted he was not guilty of the three charged crimes.

### The Verdict and Sentencing

On count 1, the jury found Mendez not guilty of the murder of DeAngelo, not guilty of the lesser included offense of second degree murder, but guilty of the alternate

4.

theory of accessory after the fact. On count 2, the jury found Mendez not guilty of the attempted murder of J.S., not guilty of the lesser included offense of attempted second degree murder, but guilty of the alternate theory of accessory after the fact. On count 3, the jury convicted Mendez of conspiracy to commit murder, found all of the alleged overt acts to be true, and found both enhancements to be true.

Pursuant to section 182, subdivision (a)(1), the trial court sentenced Mendez to a term of 25 years to life for the conspiracy to commit murder conviction in count 3, enhanced by a term of 25 years to life pursuant to the provisions of section 12022.53, subdivisions (d) and (e)(1). The sentence on counts 1 and 2 were stayed pursuant to section 654.

## DISCUSSION

### I.   *Batson/Wheeler* Motion

Mendez made two motions for a mistrial based on the prosecutor's exercise of peremptory challenges. The first motion was made after the prosecutor exercised his first two peremptory challenges to Prospective Jurors Nos. 1399 and 5225. The second motion was made after the prosecutor exercised a total of 11 peremptory challenges, including Prospective Jurors Nos. 3307 and 4454.

The primary ground for Mendez's motions was the fact that each of the challenged potential jurors was Hispanic. After each motion the trial court found Mendez had made a prima facie showing the prosecutor was exercising his peremptory challenges in a discriminatory manner. After the prosecutor explained his reasons for the use of the peremptory challenges, the trial court found there were nondiscriminatory reasons for the prosecutor's challenges and denied the motions. Mendez argues the trial court's ruling was erroneous.

#### A.  The Law

The California Supreme Court recently set forth the applicable legal standards when a *Batson/Wheeler* motion is made.

"A prosecutor's use of peremptory challenges to excuse prospective jurors on the basis of group bias, including on grounds of race or ethnicity, violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.] Under *Batson, supra,* 476 U.S. 79, such practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]

"'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" [Citation.]' [Citation.]

"'A prosecutor asked to explain his conduct must provide a "'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." [Citation.] "The justification need not support a challenge for *cause,* and even a 'trivial reason,' if genuine and neutral, will suffice." A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' [Citation.] '[B]ut race-based decisions are not constitutionally tolerable.' [Citations.]

"Therefore, 'at the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]' [Citations.]

"'"'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a

6.

prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]'" [Citation.]' [Citation.]

"'"'The trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.'"' [Citation.] "'All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' [Citation.] A reason that makes no sense is nonetheless 'sincere and legitimate' as long as it does not deny equal protection. [Citation.]" [Citation.]' [Citation.]

"'"'As part of our analysis, we consider as 'bearing on the trial court's factual finding regarding discriminatory intent' [citation] the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs, though few if any of these comparisons were made in the trial court. At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" [Citation.]' [Citation.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 101-103.)

### B. Motion No. 1

The first motion was made after the prosecutor exercised his first two peremptory challenges on Prospective Jurors Nos. 1399 and 5225. We begin by reviewing the proceedings leading up to these two challenges.

**The Jury Questionnaire**

Each potential juror was presented with a jury questionnaire to complete several days before jury selection began.

### *Prospective Juror No. 1399*

Prospective Juror No. 1399 was a retired 69-year-old married male who lived at home with his wife. He has seven grown children. He stated he graduated from high school but did not attend college, had not served in the military, denied past jury service, had been arrested for solicitation and apparently sustained a conviction of some type, and had a nephew who was "run over" by a drunk driver and a cousin and a brother-in-law who were murdered; he also stated he had been the victim of auto theft. He testified as a character witness for a coworker who had been charged with murder. He denied hearing about the case in the media and denied any negative feelings towards law enforcement. He strongly disagreed with the statement that "The courts are trustworthy," and stated that a person who acted as a lookout for a burglar should be just as liable as the burglar if the two planned the crime together. However, he felt a getaway driver would not be as guilty as the person who stabbed a victim unless the driver could have stopped the crime.

### *Prospective Juror No. 5225*

Prospective Juror No. 5225 was a 34-year-old mother of six children who was employed as a family service representative. She had graduated from high school and attended college, during which time she was enrolled in several criminal justice classes. She denied any past jury experience. Her brother, son, and ex-husband had been charged with crimes, although the types of crimes were not stated. She stated she had been the victim of domestic violence at the hands of her ex-husband, which probably resulted in charges against him. He shot at her and threatened her with a gun several times. She also testified in her cousin's case when he apparently was charged with sexual assault.

She had seen some information in the media about the case, and one of her nephews stated he knew the victim from high school. The information made her sad. Her brother had a tattoo on his forearm that read "M St. Mob." She experienced migraine headaches and indicated they might make it difficult for her to serve on the jury, although she had medication for the condition.

8.

She acknowledged that a lookout or a getaway driver could be liable for the crime committed by another perpetrator, depending on the circumstances involved.

### Voir Dire

The trial court began voir dire by asking all potential jurors in the jury box general questions about their ability to serve as jurors. In addition, the parties were permitted limited voir dire.[3]

#### *Prospective Juror No. 1399*

Prospective Juror No. 1399 did not respond to any of the trial court's questions. The prosecutor began voir dire by asking general questions of the entire panel about witnesses. He specifically asked Prospective Juror No. 1399 how he would determine whether a witness was believable. Prospective Juror No. 1399 responded that he would base his analysis on past experiences in interacting with people. That was the only question asked of this prospective juror by either attorney.

#### *Prospective Juror No. 5225*

Prospective Juror No. 5225 responded to two questions posed by the trial court. First, she indicated that one of the police officers, who was a potential witness in the trial, had been a friend of her husband's for a long time. She denied the relationship would have any effect on her ability to be impartial.

She also explained that she knew the district attorney because their sons were friends. She again denied that the relationship would have any effect on her ability to be impartial.

---

[3]Each party was given 30 minutes to voir dire the initial 27 potential jurors called to the jury box. For cause and peremptory challenges were then exercised until only 11 potential jurors were left in the jury box. The trial court then called 16 additional potential jurors from the panel. Each party was then given 15 minutes to conduct voir dire on any of the 27 potential jurors now in the jury box. This process was repeated until a jury was selected.

Neither attorney asked Prospective Juror No. 5225 any questions on voir dire.

**The Prosecutor's Justification for the Peremptory Challenges**

The prosecutor's explanation for his decision to exercise a peremptory challenge was somewhat disjointed. It appears that someone in the district attorney's office had reviewed the jury questionnaires before jury selection began and had given each questionnaire a "grade," which indicated the desirability of that particular juror serving on the panel. It also appears that the prosecutor trying the case did not grade the questionnaires and based his decision whether to accept or reject a juror largely on the grades given to the questionnaires.

While the use of such a grading system does not necessarily violate any of Mendez's constitutional rights, a constitutional violation would occur if the grades were based on race. The record, however, does not contain any evidence on how the grades were assigned; therefore, we have no basis to conclude the grading system violated Mendez's constitutional rights.

Because we do not know on what criteria the grading system was based, we must base our review solely on the various reasons identified by the prosecutor for the challenges. The prosecutor noted that Prospective Juror No. 1399 stated on his questionnaire that he had been convicted of misdemeanor solicitation, the questionnaire was full of misspellings, and the prospective juror stated he had testified as a character witness for a defendant accused of murder. The prospective juror also strongly disagreed with the statement that the courts were trustworthy. Finally, he indicated he did not feel accomplices should be punished the same as a perpetrator.

The prosecutor noted that Prospective Juror No. 5225 stated she had taken some criminal justice classes, which caused the prosecutor concern because such jurors sometimes make decisions based on what they think the law is rather than the law given to them by the trial court. Prospective Juror No. 5225 also stated she would not have any problem deciding the case because of her religious beliefs, but she might not be able to

10.

impose the death penalty because of those beliefs. The prosecutor explained that this caused concern that the prospective juror might make decisions on her religious beliefs and not the law. The prospective juror also said that her brother, son, and ex-husband had been charged with crimes, causing concern about bias against law enforcement. The prospective juror also had been a victim of domestic violence and had been a witness in her cousin's sexual assault case, both of which caused the prosecutor concern. Finally, the prospective juror's brother apparently was in a gang, since he had a gang tattoo on his arm and this gang tattoo was for the same gang involved in this case.

**The Trial Court's Ruling**

The trial court found there were race-neutral reasons for the prosecutor's exercise of the peremptory challenges and denied the motion with little explanation.

**Analysis**

We agree with the trial court's conclusion. The voir dire did not provide any useful information for either attorney, so the decision to exercise peremptory challenges was based almost entirely on the jury questionnaires, which supported for the most part the prosecutor's justifications for the challenges. Prospective Juror No. 1399 stated in his questionnaire that he had been arrested for solicitation, had testified as a character witness for a coworker charged with murder, did not feel the trial courts were trustworthy, and did not feel an accomplice should be as liable as the perpetrator. These were all race-neutral reasons for exercising a peremptory challenge.

Prospective Juror No. 5225's questionnaire also supported the prosecution's justifications. She stated in her questionnaire that her brother had a gang tattoo, a strong indication he was in a criminal street gang. She also stated several relatives had been charged with crimes, her religious views would interfere with her ability to impose the death penalty, and she had taken several criminal justice classes. Each of these reasons was race-neutral and supported the trial court's ruling.

11.

*C. Motion No. 2*

The second motion was made after the potential jurors excused from the panel were replaced with new potential jurors from the venire. Both sides exercised numerous peremptory challenges. Mendez made the second motion after the prosecutor exercised his ninth challenge against Prospective Juror No. 3307. Mendez asserted the ninth peremptory challenge and the sixth peremptory challenge used against Prospective Juror No. 4454 were based on race.

**The Jury Questionnaire**

*Prospective Juror No. 3307*

Prospective Juror No. 3307 was a 33-year-old single Hispanic female with three children. She had graduated from college and vocational school. She had never served on a jury. Neither she nor a family member had ever been charged with a crime, nor had she been a victim of a crime other than when someone broke into her house.

She had not heard anything about the case from media reports.

She "Somewhat Disagree[d]" that police and the courts are trustworthy. She would judge police officer testimony the same as any other witness. She denied any gang knowledge or involvement for either herself or her family.

She felt that accomplices were as guilty as the perpetrator.

*Prospective Juror No. 4544*

Prospective Juror No. 4544 was a 19-year-old single Hispanic female. She had graduated from high school and was attending college. She had never served on a jury. Neither she nor a family member had been charged with a crime. She had never been a victim of a crime. She did not feel that street gangs were a positive activity for youth.

She might have read about the crime in newspapers or discussed it with friends, but she could not recall anything she had read or heard. She had not formed any opinion about the case.

She had had no contact with law enforcement, but she felt that sometimes police officers did not see the whole situation before they decided not to act. She stated she would not judge a police officer's testimony by the same rules as other witnesses because a police officer may know the law and will see "loop holes."

She knew gangs probably existed in her home town, but she did not know any gang members or of any problems they caused in her neighborhood. She did not have any friends or family members who were involved in gangs.

She stated she would feel obligated to reach a verdict because that was the vote of the majority, but denied she would vote a certain way because she wanted to have a unanimous verdict.

She did not feel that a lookout or getaway driver should be punished the same as the perpetrator, but she felt there should be some punishment (perhaps a fine).

### Voir Dire

#### *Prospective Juror No. 3307*

Prospective Juror No. 3307 did not respond to any of the trial court's questions. The prosecutor asked Prospective Juror No. 3307 a general question about circumstantial evidence, to which the prospective juror responded appropriately. Defense counsel did not ask any questions of Prospective Juror No. 3307.

#### *Prospective Juror No. 4454*

Prospective Juror No. 4454 did not respond to any of the trial court's questions, nor did either attorney question this prospective juror during voir dire.

### The Prosecutor's Justification

The prosecutor noted Prospective Juror No. 3307 had failed to answer a question about whether she or a family member or a close friend had been subject to a violent act, even if that act was not a crime. He also noted the prospective juror somewhat disagreed with the statement that courts are trustworthy and strongly disagreed with the statement

13.

that if the prosecutor failed to prove his case beyond a reasonable doubt, the Constitution required the jury to find the defendant not guilty.

The prosecutor felt that Prospective Juror No. 3307's explanation to the question about accomplice liability was unclear. The question asked whether a person who acted as a getaway driver was just as guilty as the perpetrator who stabbed the victim. The prospective juror responded, "I don't know how to answer this question. [D]oes the drive[r] know the person is going to stab another person[?] If so he is guilty."

For Prospective Juror No. 4454, the prosecutor noted the prospective juror stated she might have to look away at a "really gruesome" picture. In addition, she answered both questions about accomplice liability by stating she did not think the accomplice was as guilty as the perpetrator. The prosecutor identified accomplice liability as a significant issue in the case and explained that anyone who did not think an accomplice would be as guilty as a perpetrator was unacceptable to the prosecution.

### The Trial Court's Ruling

The trial court focused on Prospective Juror No. 3307, apparently concluding that the prosecutor had a valid reason for excusing Prospective Juror No. 4454. The trial court noted the prosecutor's stated reasons were weak but found that from a subjective standpoint, skepticism about the fairness of the criminal justice system was a legitimate basis for exercising a peremptory challenge (citing *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386 (*Calvin*)). Accordingly, the trial court denied the motion, concluding there was not purposeful discrimination under the totality of the circumstances.

### Analysis

We agree with the trial court's conclusion that the peremptory challenge exercised on Prospective Juror No. 4454 was supported by a race-neutral reason. The record supports the prosecutor's statement that Prospective Juror No. 4454 expressed doubts about accomplice liability. Since the prosecution of Mendez was based entirely on

14.

accomplice liability, sound trial strategy supports the conclusion that the prosecutor would excuse a juror who expressed doubts about the concept.

Like the trial court, we think the prosecutor's explanation for the challenge of Prospective Juror No. 3307 is much weaker. Unlike the prosecutor, we see the prospective juror's response to the question about accomplice liability as clear and concise (although grammatically incorrect), and that it expressed a view consistent with the law.

We also think the prosecutor's concern that the prospective juror failed to complete a question about whether she or anyone she knew had been a victim of a violent act is disingenuous. The prospective juror answered several questions related to her experiences with violent crimes, and she denied that she, a family member, or a close friend ever had been the victim of a violent crime. She also denied that she, a family member, or a close friend ever had witnessed a violent act.

From these two answers, the prosecutor easily could have inferred the answer to the omitted question. Or, if the prosecutor truly was concerned, he could have questioned Prospective Juror No. 3307 about the omission. The prosecutor's failure to explain to the trial court why this omission was important, and his failure to question the prospective juror about the omission, strongly suggests this proffered explanation for the challenge was not genuine.

Similarly, the prosecutor's identification of Prospective Juror No. 3307's response to the question about reasonable doubt does not appear to be genuine. The questionnaire in this section made a statement and asked the prospective juror to respond to the statement with one of four responses—(1) strongly agree, (2) somewhat agree, (3) somewhat disagree, and (4) strongly disagree. The statement to which the prosecutor referred was "If the District Attorney does not prove his case beyond a reasonable doubt the Constitution requires that a juror find the defendant 'not guilty.' Please share how you feel about this principal." Prospective Juror No. 3307 responded that she strongly

15.

disagreed with the statement, indicating that she felt the prosecution's burden of proof should be lessened. Since this was a position highly favorable to the prosecution, this response by Prospective Juror No. 3307 would not explain the decision to exercise a peremptory challenge to this juror.

The final ground cited by the prosecutor for this challenge was Prospective Juror No. 3307's response to another statement in the questionnaire. The statement in the questionnaire was "The courts are trustworthy." Prospective Juror No. 3307 responded that she somewhat disagreed with the statement. As the trial court noted in making its ruling, distrust of the court system is a valid ground for exercising a peremptory challenge. (*Calvin, supra,* 159 Cal.App.4th at p. 1386.) Since Prospective Juror No. 3307's response suggested she distrusted the court system, we conclude the prosecutor provided a valid, race-neutral ground for exercising a peremptory challenge to Prospective Juror No. 3307 that is supported by the record.

### D. Additional Contentions

Citing *People v. Taylor* (2010) 48 Cal.4th 574, Mendez argues that because the prosecutor did not engage "in more than desultory voir dire, or indeed to ask them any questions at all" we should conclude the peremptory challenges were based on the challenged juror's race. He notes the prosecutor did not ask any questions of Prospective Jurors Nos. 5225 and 4544 and asked only superficial questions of Prospective Jurors Nos. 1339 and 3307. None of those questions related to the justification for the peremptory challenge. Mendez argues that if the prosecutor was concerned about the responses in the questionnaires, he would have questioned the excused prospective jurors on the topics that caused him concern. Mendez asserts the failure of the prosecutor to do so "is powerful evidence that his alleged reasons as to all four prospective jurors were not sincere, and were pretextual."

*Taylor* noted the failure to ask any voir dire questions of a potential juror normally is relevant to the prosecutor's motivation, but concluded the issue was irrelevant in that

case because the trial court did not allow either attorney to conduct voir dire. (*Taylor, supra,* 48 Cal.4th at p. 615.) The Supreme Court cited *People v. Kelly* (2007) 42 Cal.4th 763 as authority for the proposition that the failure to voir dire a potential juror may be relevant, but *Kelly* made the statement in the context of the first part of the *Batson/Wheeler* analysis (deciding whether the defendant made a prima facie showing that the prosecutor utilized his peremptory challenges for discriminatory purposes). (*Kelly,* at p. 779.) *Kelly*, in turn, cited *People v. Bonilla* (2007) 41 Cal.4th 313, 341 as authority for the proposition. *Bonilla* also made the statement in the context of deciding whether the defendant had made a prima facie showing of discrimination. *Bonilla*, in turn, cited *Wheeler* as authority for the proposition. (*Bonilla,* at p. 342.) *Wheeler* also made the statement in the context of determining whether the defendant had made a prima facie showing of discrimination. (*Wheeler, supra,* 22 Cal.3d at pp. 280-281.) Therefore, these cases do not stand for the proposition that the lack of voir dire is relevant in determining whether the prosecution's stated reasons for excusing a juror are a pretext.

However, *Miller-El v. Dretke* (2005) 545 U.S. 231, also cited by Mendez, supports the proposition. Like the case before us, the panel was provided with a questionnaire and was subject to voir dire by the attorneys. When the prosecutor in *Miller-El* was asked to provide a race-neutral explanation for a peremptory challenge against an African-American potential juror, the explanation he gave as the sole basis for the challenge misrepresented the answers on the potential juror's questionnaire. When this discrepancy was pointed out, the prosecutor provided a second reason for the challenge related to the potential juror's disclosure that his brother had been convicted of drug offenses. The Supreme Court found the new reason for the challenge as further evidence of discriminatory intent. "It would be difficult to credit the State's new explanation, which reeks of afterthought. While the Court of Appeals tried to bolster it with the observation that no seated juror was in [the juror's] position with respect to his brother, [citation], the court's readiness to accept the State's substitute reason ignores not only its pretextual

17.

timing but the other reasons rendering it implausible.  [The juror's] testimony indicated he was not close to his brother, [citation] … and the prosecution asked nothing further about the influence his brother's history might have had on [the juror], as it probably would have done if the family history had actually mattered.  See, *e.g.*, *Ex parte Travis* (2000) 776 So. 2d 874, 881 (Ala. 2000) ('[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination').  There is no good reason to doubt that the State's afterthought about [the juror's] brother was anything but makeweight." (*Miller-El,* at p. 246.)

Even with this authority to aid him, Mendez's argument fails.  The prosecutor's voir dire of all of the potential jurors was minimal, at best.  The time provided for voir dire was limited (30 minutes for the initial panel and 15 minutes when the panel was "restocked").  The prosecutor did not utilize this time to explore concerns raised by the jury questionnaire with any potential juror.  He used the voir dire to indoctrinate the potential jurors on the issues that would be presented in the case, without attempting to explore whether the potential juror's position on those issues would affect the potential juror's suitability to serve on the case.  Instead, from all appearances, the prosecutor chose to rely on only the grading system utilized by the district attorney's office that was completed before trial.

Finally, Mendez asks us to perform a comparative analysis of the potential jurors who were challenged with the jurors who served on the jury.  When we perform this analysis, we are mindful of the Supreme Court's repeated warnings about such posttrial analysis.

"The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor.  [Citations.]" (*DeHoyos, supra*, 57 Cal.4th at p. 109.)  However, "'we are

mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] 'One of the problems of comparative juror analysis not raised at trial is that the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges. When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.' [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 561.)

The superficial comparative analysis suggested by Mendez is not helpful. Mendez makes vague generalizations about some of the prosecutor's explanations for challenging some of the potential jurors, but does not attempt to explain how a specific juror that the prosecutor challenged compares favorably to a potential juror that remained on the panel. For example, Mendez broadly states that "many seated jurors' views of the criminal justice system and reasonable doubt were similar to those of the dismissed Hispanic prospective jurors," with a long citation to the record. We are left to divine for ourselves to which dismissed potential juror Mendez is referring. Nor is there any attempt to explain how the opinions were similar, or how one of the seated jurors compared to a dismissed potential juror.

Mendez was required to present a reasoned legal analysis supported by citation to relevant legal authority and citation to facts in the record that support his argument. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.) A competent comparative analysis requires Mendez to identify a seated juror who had the same or similar answers to the questionnaire as an excused juror on *all relevant topics*, not simply an isolated issue. We take Mendez's failure to do so to be a concession that a thorough comparative analysis does not support his argument.

Also, the record indicates that several Hispanic surnamed individuals served on the jury. Mendez makes no attempt to rebut any obvious impact this would have on a comparative analysis.

*E. Conclusion*

There is substantial evidence in the record to support the race-neutral reasons cited by the prosecutor for his decision to exercise peremptory challenges on Prospective Jurors Nos. 1399, 5225, 3307, and 4544. The trial court made a sincere and reasoned attempt to evaluate the nondiscriminatory justifications offered by the prosecutor. Exercising the great restraint with which we must review *Batson/Wheeler* claims, we conclude that the trial court did not err in denying Mendez's motions.

The trial court's analysis, however, was made more difficult because of the procedure utilized by the district attorney's office. There is nothing inherently wrong with grading potential jurors based on their responses on a jury questionnaire. However, when the attorney trying the case does not participate in this process, as appears to be the case here, that attorney is left to attempt to justify a peremptory challenge without knowing its basis. The justifications offered, therefore, naturally will appear to be less credible than those offered by an attorney who decided to exercise the peremptory challenge. It also is conceivable the trial court may require the attorney or attorneys in the district attorney's office who graded the questionnaire to attend the motion to explain their grading system. Such a process would allow the trial court to ensure the challenges were based on a race-neutral reason, although the process would be inefficient.

## II. Verdict Form

Mendez challenges the verdict on count 3, conspiracy to commit murder. The issue arises because of a lack of clarity in the verdict form.

The seconded amended information charged Mendez with conspiracy in count 3. The count was entitled "Conspiracy to Commit A Crime—Felony." The charging language alleged Mendez conspired to murder DeAngelo and J.S. Five overt acts were

20.

listed: (1) coconspirators called Mendez to transport them to the crime scene; (2) Mendez drove the coconspirators to the crime scene; (3) Mendez waited in his car for the coconspirators to shoot the victims; (4) Mendez drove the coconspirators away from the crime scene after the crime was committed; and (5) Mendez hid the co-conspirators' murder weapons after the crime was committed.

At the beginning of the jury selection process, the trial court informed the jury of the crimes, stating, "it is alleged the defendant conspired with others to shoot [DeAngelo and J.S.]" After the jury had been chosen, the information, which was not sent into the jury room, was read to the jury, including count 3, which charged Mendez with conspiring to murder DeAngelo and J.S.

The jury instructions were read to the jury before closing argument. The relevant portions of the instruction stated:

> "The defendant is charged in Count Three with conspiracy to commit murder in violation of Penal Code [section] 182. To prove the defendant is guilty of this crime, the People must prove that: One, the defendant intended to agree and did agree with one or more perpetrators to intentionally and unlawfully kill; two, at the time of the agreement, the defendant and one or more alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill; three, the defendant and at least one or more or all of them committed at least one of the following overt acts alleged to accomplish the killing: A, unknown conspirators called the defendant to pick them up at a location to transport them to the crime location; B, the defendant drove the co-conspirators to the crime location; C, the defendant waited in his parked vehicle for the co-conspirators to shoot the victims; D, the defendant drove the co-conspirators/shooters away from the crime scene; and, E, the defendant hid the co-conspirators['] murder weapon under his bed and mattress; and, four, at least one of these overt acts was committed in California. To decide whether the defendant committed these overt acts, consider all of the evidence presented about the acts.

> "To decide whether the defendant and other alleged members of the conspiracy intended to commit murder, please refer to instruction for Count One, which define that crime.

21.

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime. The overt act must happen after the defendant had agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself."

In closing argument, both the prosecutor and defense counsel addressed the count as conspiracy to commit murder. The prosecutor began his closing argument by reminding the jury of the crimes with which Mendez was charged, including "conspiracy to commit murder." In his more detailed discussion of the charges, the prosecutor stated, "Now conspiracy is an agreement by two or more people to commit a crime. And in this case, the conspiracy is to commit first-degree murder and commit first-degree murder on some person out there at the [location of the murder], who turned out to be DeAngelo …." The prosecutor went on to discuss the evidence he asserted supported the charges, repeatedly referring to the conspiracy to commit murder, and no other possible conspiracy.

When referring specifically to count 3 in his closing argument, defense counsel also focused on a conspiracy to commit murder.

"In order to convict [Mendez] of conspiracy, you must be convinced beyond a reasonable doubt that [Mendez] intended to agree and did agree to kill another human being and that his actions were premeditated. That's why we're here. That's what this trial is about.

"In other words, the District Attorney has to prove to you that [Mendez] knew what the others were going to do, that he was in on it, and he was down for it. And I must have made a typo in there, but that's what I meant to say. He knew what they were going to do, he was in on it, and he was down for it.

22.

"If you find that [Mendez] merely accompanied or associated with members of a conspiracy, but did not intend on murdering or attempting to murder another human being, then [Mendez] is not a member of the conspiracy."

Defense counsel then focused on his main argument on this point -- that there was a lack of evidence Mendez participated in a conspiracy to commit the shootings that night. For example, he told the jury, "You must be convinced beyond a reasonable doubt that [Mendez] acted with a common purpose to commit premeditated murder—that's what they've alleged here—and premeditated attempted murder." Defense counsel did not state or suggest Mendez could be convicted in count 3 of conspiracy to commit any crime other than murder.

In his rebuttal argument, the prosecutor referred to the conspiracy count in general terms only. However, he did not state or suggest there was a conspiracy to commit any crime other than murder.

Questions from the jury began early in the deliberation process. One of the first questions posed by the jury requested a diagram be sent into the jury room that apparently was created during opening statements and listed all of the charges. The trial court refused the request because the diagram had not been entered into evidence and it did not include the accessory allegations.[4] Instead, the trial court responded to the question by informing the jury it should "Consult jury instructions and/or verdict forms."

Possible issues with the verdict form were first recognized when the jurors raised the question of whether they could find Mendez guilty of accessory instead of, or in addition to, the murder charges. In a discussion that took place outside the presence of the jury, the trial court recognized there would be a possible inconsistency in the verdict if the jury found Mendez not guilty of murder or attempted murder but guilty of being an accessory *and* guilty of conspiracy to commit murder. The trial court explained that the

---

[4]It appears the accessory allegations were added sometime during the trial.

23.

accessory verdicts would indicate the jury found that Mendez did not know the other individuals in his car went to the apartment complex to murder someone, while the conspiracy count would require the jury to conclude he agreed before the murder was committed to participate in a plan to commit the murders. These two positions contradict each other. The trial court did not attempt to resolve the issue, even though it recognized it might arise. The jury never asked a question about the conspiracy charge or the verdict form.

When the verdicts were returned, the trial court examined the documents and found the jury had acquitted Mendez of the murder charges but had convicted him of the accessory charges and the conspiracy charge. The trial court then took a break to research the issue before recording the verdicts. A discussion eventually was held on the record where the prosecutor urged the trial court to allow the verdict to stand, even if it was an inconsistent verdict. He also argued the verdicts were not necessarily inconsistent based on a hypothetical situation that finds no support in the record.

Defense counsel pointed out the verdict form stated the jury found Mendez guilty of conspiracy to commit a crime, not conspiracy to commit murder. He asserted that if the trial court concluded the verdict forms meant that Mendez was guilty of conspiracy to commit murder, "then we need to further argue and further instruct and send them new verdict forms." Defense counsel pointed out the jury carefully followed the verdict forms, including finding errors in the verdict forms that had to be corrected before the jury could reach a verdict. He repeatedly asked the trial court to make sure the jury intended to convict Mendez of conspiracy to commit murder before the jury was dismissed and not assume the trial court knew what the jury intended to do.

The trial court noted the verdict form used the same language as the second amended information, which labeled count 3 as "Conspiracy to Commit A Crime." The trial court also pointed out that there was no confusion or ambiguity in the trial or

24.

argument to suggest there was any conspiracy other than conspiracy to commit a murder. The trial court concluded, therefore, there was no need to alter the verdict form.

Next, the trial court concluded the jury could have found a conspiracy to commit a murder of some unidentified third individual so that this verdict was not inconsistent. Accordingly, the jury was brought back and the verdict was recorded.

Mendez argues that because the jury verdict form was unclear, we cannot be certain of which crime he was convicted. The basis for this argument is the acquittal the jury returned on the murder charges. Logically, once the jury found Mendez not guilty of murder and attempted murder, it also should have found him not guilty of conspiring to commit murder.

Defense counsel executed a declaration stating he was told by jury members that they found Mendez guilty of conspiracy to commit a crime, as stated in the verdict from. The crime, however, was conspiracy to be an accessory after the fact, not attempted murder.

It is obvious the verdict form was unclear. "Under section 182, the jury must determine which felony the defendants conspired to commit." (*People v. Cook* (2001) 91 Cal.App.4th 910, 918.) The jury also must find the defendant had the specific intent to commit the elements of that offense. (*People v. Morante* (1999) 20 Cal.4th 403, 416.) Accordingly, the jury must know what crime the defendant was accused of conspiring to commit, as well as the elements of that crime. By labeling count 3 in the verdict form as "Conspiracy to Commit A Crime" without identifying what crime the conspirators agreed upon, the verdict form permitted the jury to focus on conspiracy to commit a crime other than the one stated in the information.

This lack of clarity is the basis for Mendez's argument that the jury found him guilty of conspiracy to be an accessory after the fact, a crime with a much less severe punishment than conspiracy to commit murder. Obviously, the better practice, and one that would have avoided this issue completely, would have been simply to label count 3,

25.

both in the information and the verdict form, as conspiracy to commit murder, the crime with which Mendez was charged.  The failure to do so has resulted in a verdict that arguably is ambiguous.[5]

Where a verdict is ambiguous it must be construed """"in light of the issues submitted to the jury and the instructions of the court." [Citations.]' [Citations.]" (*People v. Jones* (1997) 58 Cal.App.4th 693, 710.)  It also must "be read in light of the charging instrument and the plea entered by the defendant.  [Citations.]" (*People v. Paul* (1998) 18 Cal.4th 698, 706.)

Application of these rules establishes the validity of the verdict.  The charging instrument, which was read to the jury, charged Mendez with conspiracy to murder DeAngelo and J.S.  The case was tried on the theory that Mendez conspired with three other men to murder DeAngelo and J.S.  The jury instructions and closing argument of both counsel reinforced the theory that Mendez was charged with conspiring with three other men to murder DeAngelo and J.S.  The consistency of the presentation of the case to the jury establishes that the verdict must be construed as finding Mendez guilty of conspiring to murder DeAngelo and J.S.

We have reviewed each of the cases cited by the parties.  These cases confirm our conclusion.  Two of the cases, *People v. Camacho* (2009) 171 Cal.App.4th 1269 (*Camacho*) and *People v. Soto* (1985) 166 Cal.App.3d 428 (*Soto*), demonstrate why this is the correct conclusion.

In *Camacho*, the defendant and an accomplice forced two women from their vehicle and drove off with the women's personal belongings remaining in the vehicle. The defendant was charged with two counts of carjacking and two counts of second

---

[5]It is unclear why the trial court concluded the verdict form was proper simply because it contained the same label as the information.  If the information had simply accused Mendez of conspiracy to commit a crime, it would not have withstood a demurrer for vagueness.

26.

degree robbery.  One count of each crime referred to each woman, i.e., one count of carjacking and one count of robbery referred to victim one and the second count of carjacking and the second count of robbery referred to victim two.  The case was presented to the jury under this theory, and the instructions and arguments were consistent.  The verdict form for victim one erroneously labeled both crimes as carjacking.  The appellate court had

> "no difficulty in determining the jury intended to find defendant guilty of second degree robbery of [victim two] as charged in count 2.  This case was tried from start to finish with the understanding defendant was charged with two counts of carjacking and two counts of second degree robbery.  Prior to jury selection, the trial court indicated its intent 'to read the information verbatim' and there is no indication the trial court failed to do so.  In his opening statement, the prosecutor informed the jury he would be seeking guilty verdicts for carjacking and robbery of both victims.  The jury instruction on intent referred to 'Robbery, as charged in Counts Two and Four' and 'Carjacking as charged in Counts One and Three.'  The instruction on the elements of the charged offenses indicated 'defendant is charged in Counts Two and Four' with robbery, and he was 'charged in Counts One and Three' with carjacking.

> "In argument to the jury, the prosecutor stated, 'I'm going to start with carjacking which is counts 1 and 3 ….'  At the end of the opening argument the prosecutor requested guilty verdicts 'for two counts of carjacking, two counts of robbery and a finding the special allegation is true.'  Defense counsel made it clear that defendant was charged, as to each [victim], with one count of carjacking and robbery.

> "The defense sentencing memorandum repeatedly refers to the charge in count two as robbery.  The prosecution sentencing memorandum also indicates a repeated understanding that defendant was convicted of robbery in count 2.  For purposes of sentencing, neither the parties nor the trial court treated the conviction in count 2 as a conviction of the crime of carjacking; instead, defendant was sentenced for robbery in count 2.  [Citation.]"  (*Camacho, supra,* 171 Cal.App.4th at pp. 1273-1274, fn. omitted.)

These circumstances convinced the appellate court that "there is no uncertainty in the record on appeal as to the charge in count 2.  The verdict finding defendant guilty in

count 2 cannot be construed as an express acquittal of robbery in the face of a record unambiguously demonstrating the charge in count 2 was robbery and not carjacking." (*Camacho, supra,* 171 Cal.App.4th at p. 1275.)

Likewise, there is no uncertainty in this record that Mendez was charged with, and convicted of, conspiracy to murder DeAngelo and J.S. Accordingly, we reject the assertion that the conviction must be reversed because the verdict was ambiguous.

Mendez asserts that *Soto* supports his argument. Soto was charged with first degree murder, robbery, and conspiracy to commit robbery. Numerous enhancements also were alleged, including the special circumstance that the murder was committed during the commission of a robbery.

The jury was instructed that second degree murder was a lesser offense to the first degree murder charge. The jury found Soto not guilty of first degree murder. The verdict form, however, fixed the degree of murder to be of the second degree. This discrepancy apparently occurred because the jury was not given a verdict form that would allow it to find Soto guilty of second degree murder. Another verdict form found true the allegation that Soto was armed with a firearm during the commission of the murder, while yet another verdict form found that Soto did not use a firearm during the commission of the murder within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). (*Soto, supra,* 166 Cal.App.3d at p. 432.)

The parties, including defense counsel, interpreted the verdict as finding Soto guilty of second degree murder. This court rejected the argument. "We conclude that because the verdict form expressly found [Soto] 'not guilty' of murder and did not expressly find him 'guilty' of second degree murder, we may not construe the verdict to find [Soto] guilty of second degree murder. To do this would be an impermissible alteration of a verdict contrary to the defendant's right to an unequivocal verdict on the question of his guilt." (*Soto, supra,* 166 Cal.App.3d at p. 438.)

Mendez is not in the same postion as Soto. The verdict found Mendez guilty of conspiracy. His argument, as explained above, is that the verdict form was ambiguous because it failed to state that the jury found Mendez guilty of conspiracy to commit murder. This argument is much more similar to *Camacho* than *Soto*. Accordingly, we conclude that *Soto* does not support Mendez's argument.

In reality, the argument Mendez is making is that the verdict was inconsistent. As explained above, logic suggests that when the jury found Mendez not guilty of the murder counts, and instead found him guilty of being an accessory after the fact, the jury also should have found him not guilty of conspiring to murder DeAngelo and J.S. Moreover, two of the overt acts the jury found true related to events that occurred before the shooting. One would expect that if the jury found these overt acts were true, the jury also would have found Mendez guilty of the murder counts, *unless* the jury concluded that Mendez did not know what the shooters were going to do. Needless to say, this was Mendez's defense to the murder and conspiracy charges. Once the jury decided Mendez did not know what the shooters were going to do, one would expect the jury also would have decided there was no conspiracy.

It has been long established, however, that inconsistent verdicts must be allowed to stand. "Prior to 1927, appellate courts of this state … held that inconsistent verdicts 'would not support a judgment of conviction.' [Citations.] In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' [Citations.] … [¶] Since 1927 our courts have followed the general rule and viewed an inconsistent acquittal as the product of confusion or an act of mercy on the part of the jury, of which an appellant is not permitted to take further advantage. [Citations.]" (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656-1657 (*Pahl*); see also *People v. Santamaria* (1994) 8 Cal.4th 903, 911 ["It is … settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually

irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both."].)

As *Pahl* explained, "The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. [Citation.] Understandably, in such cases defendants … take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. [Citation.] In other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion.…' [Citations.]" (*Pahl, supra,* 226 Cal.App.3d at p. 1656.)

We do not know whether the jury found Mendez not guilty of the murder counts because of compassion or a sense of leniency. We are certain, however, that the guilty verdict on the conspiracy count must stand, despite the apparent inconsistency.

## III. Refusal to Release Jury Identifying Information

In the preceding section, we did not address Mendez's claim that a juror or some jurors told defense counsel after the trial that they found Mendez guilty of conspiracy to be an accessory after the fact and not conspiracy to commit murder. According to defense counsel's declaration, these jurors also stated that if the verdict form had labeled count 3 as conspiracy to commit murder, the jury would have found Mendez not guilty.

In his response to the prosecution's opposition to a motion to strike enhancements, defense counsel included a declaration executed by Juror No. 6 that stated, "After lengthy deliberation, myself, as well as other jurors, were convinced that because we had found Juan Mendez guilty of accessory after the fact, a felony, then he must necessarily be guilty of conspiracy to commit a felony. [¶] In other words, we, the jurors and myself included agreed and found that the felony which Juan Mendez conspired to commit was

30.

the felony of accessory after the fact because we agreed that Juan Mendez joined the conspiracy after the murder was completed when he agreed to drive the others away from the crime scene and hide guns. We further agreed that … it was not proved beyond a reasonable doubt that Juan Mendez committed conspiracy to commit murder. [¶] If the verdict form for count 3 had read 'conspiracy to commit Murder," the jury would have found Juan Mendez to be 'Not Guilty.'" Defense counsel executed a second declaration describing a phone conversation he had had with Juror No. 9. During that conversation, Juror No. 9 purportedly concurred with the statements made in the declaration made by Juror No. 6, but he or she refused to sign a declaration to that effect.

However, the petition for release of juror identifying information filed by Mendez pursuant to Code of Civil Procedure section 237 was supported only by defense counsel's declaration, which stated that in discussions with jurors at the conclusion of the trial, some jurors told defense counsel they found the jury instructions on count 3 to be in conflict with the verdict form. The jury instructions required the jury to decide if Mendez conspired to commit murder, while the verdict form required only that Mendez conspire to commit a crime. Some jurors also stated the verdict form implied that if they found Mendez committed the over acts, which were not directly tied to any crime, they must find him guilty of conspiracy. According to the jurors, they found Mendez guilty of conspiracy to commit the crime of being an accessory after the fact.

The prosecution opposed the motion and the trial court denied the petition. Mendez contends the trial court erred when it denied his motion.

Code of Civil Procedure section 237, subdivision (a)(2) required the trial court to seal the juror's identifying information. Subdivision (b) of this section permits any person to petition the trial court for access to the sealed records. The petition "shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal indentifying information." (*Ibid.*) Defense counsel's

petition was based on his theory that his summary of the juror's comments could be used to support a motion for a new trial.

The relevant test for determining whether juror identifying information should be released is found in *People v. Rhodes* (1989) 212 Cal.App.3d 541 (*Rhodes*). "The *Rhodes* court 'applied an express balancing test to conclude the trial court, in denying a defendant's request for disclosure of juror identifying information, did not abuse its inherent authority.' [Citation.] In *Rhodes*, the defendant, following his conviction of voluntary manslaughter, filed a motion for a new trial on the grounds of jury misconduct. [Citation.] '[T]he *Rhodes* court discerned several policy-based reasons to deny the defendant's request for disclosure of juror identifying information. These reasons included protecting a juror's state constitutional right to privacy; the possible deterrence of prospective jurors from fulfilling their obligation to serve if they knew they would be subject to postverdict intrusions into their lives; reducing incentives for jury tampering; promoting free and open discussion among jurors in deliberations; and protecting the finality of verdicts.' [Citation.] The *Rhodes* court held that there was 'an appropriate middle ground which can harmonize and satisfy [these] competing societal interests' by recognizing a rule that, 'upon timely motion, counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.… [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information ….' [Citation.]" (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)

The first issue, as we see it, is whether the juror's comments would be admissible to support a motion for new trial based on juror misconduct. We begin with Evidence Code section 1150, subdivision (a), the relevant portion of which states:

> "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"Pursuant to Evidence Code section 1150, subdivision (a), evidence of matters that may have influenced a verdict improperly is inadmissible 'to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.' 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved …. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration."' [Citations.]" (*People v. Smith* (2007) 40 Cal.4th 483, 523, fn. omitted.)

The statements related by defense counsel were primarily related to the subjective reasoning process of the jury and thus were inadmissible. Defense counsel's declaration, and the declaration of Juror No. 6, stated that the jury *concluded* there was a conflict between the jury instructions and the verdict form. The jury *reasoned* that the verdict form prevailed over the jury instructions. The jury then *decided* that the verdict form prevailed over the jury instructions. The jury *reasoned* that because they concluded Mendez committed the charged overt acts, Mendez must have conspired to commit a crime. The jury *reasoned* that conspiracy was merely a plan but was *confused* by the

33.

failure of the verdict form to connect the overt acts to a specific crime. The jury *decided* Mendez conspired to commit the felony of being an accessory after the fact.

We used the italicized verbs not only because they accurately convey the statements made by defense counsel and Juror No. 6, but because these words conclusively establish that the proffered evidence exclusively related to the jury's thought process. Accordingly, the statements were not admissible, did not provide any grounds for a new trial motion, and did not provide good cause for releasing juror identifying information.

Mendez largely ignores the inadmissibility of these statements, only suggesting he would not know what information would be obtained from the jurors until he had a chance to speak with them. It is improper, however, to release juror identifying information to permit the defendant to conduct a fishing expedition. (*People v. Granish* (1996) 41 Cal.App.4th 1117, 1126-1127, citing *Rhodes, supra,* 212 Cal.App.3d at p. 552.)

Moreover, Mendez has failed to explain how the information could be used to support a motion for a new trial. He asserts in his brief that section 1181, which provides the grounds for a new trial motion in a criminal trial, includes several grounds that do not involve jury misconduct, such as where a verdict has been decided "by lot, or by any means other than a fair expression of opinion on the part of all the jurors" or where the verdict is contrary to law or evidence. (§ 1181, subds. (4), (6).) Mendez fails to explain how the proffered evidence would support either ground for a mistrial.

Finally, Mendez asserts that because, in his words, allowing the verdict to stand will result in a miscarriage of justice, and a verdict that does not accurately reflect the agreement of the jury is a miscarriage of justice, he could have moved for a mistrial on nonstatutory grounds. (*People v. Whittington* (1977) 74 Cal.App.3d 806, 821, fn. 7.) Since, as explained above, the information Mendez sought to prove a miscarriage of justice would not have been admissible, this argument also fails.

Because Mendez failed to establish good cause for releasing juror identifying information, the trial court did not abuse its discretion when it denied his petition.

## IV.    Striking the Firearm Enhancement

Mendez contends that even if we were to affirm the conviction for conspiracy to commit murder, he still is entitled to the benefit of the doubt as to this ambiguous verdict, and therefore the verdict must be interpreted to find him guilty of a conspiracy to be an accessory after the fact.  If the conviction is for conspiracy to be an accessory after the fact, Mendez asserts the firearm enhancement is inapplicable and must be stricken.

As explained above, review of the admissible evidence in the record compels the conclusion that the verdict was not ambiguous.  The jury found Mendez guilty of the crime of conspiracy to commit murder.  Thus, the premise of this argument fails and the argument must be rejected.

## V.    Ineffective Assistance of Counsel

Exercising perfect hindsight, Mendez asserts defense counsel should have requested jury instructions on the crime of conspiracy to be an accessory after the fact as a lesser offense to count 3's conspiracy to commit murder.  Mendez claims the failure to do so rendered trial counsel ineffective and requires reversal of the judgment.

A defendant is entitled to a new trial if he received ineffective assistance of counsel at trial.  (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1036.)  "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result.  [Citations.]  A 'reasonable probability' is one that is enough to undermine confidence in the outcome.  [Citations.]

"Our review is deferential; we make every effort to avoid the distorting effects of hindsight and to evaluate counsel's conduct from counsel's perspective at the time.

35.

[Citation.] A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.] … Nevertheless, deference is not abdication; it cannot shield counsel's performance from meaningful scrutiny or automatically validate challenged acts and omissions. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541 (*Dennis*).)

"If the record contains an explanation for the challenged aspect of counsel's representation, the reviewing court must determine 'whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.' [Citation.] On the other hand, if the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation ….' [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

Mendez's argument seeks to attack the "ambiguous verdict" from a different angle. Relying on events that occurred during deliberations, Mendez is convinced that had the jury been given an option to convict him of conspiracy to be an accessory after the fact, he would not have been convicted of conspiracy to commit murder.

We reject Mendez's argument because he cannot meet either prong of an ineffective assistance of counsel claim.

First, we conclude that defense counsel's failure to request such an instruction falls within the "wide range of reasonable professional assistance." (*Dennis, supra,* 17 Cal.4th at p. 541.) We emphasize that we must avoid the "distorting effects of hindsight" and evaluate the conduct based on counsel's perspective at the time. (*Ibid.*)

The prosecutor's theory was that Mendez was an active participant in the decision to murder rival gang members. Mendez's theory was that he merely agreed to give some friends a ride without knowing, until after the shooting, that his friends planned to shoot

someone.  The jury instructions and the arguments of counsel all presented the issues to the jury emphasizing these theories.

Under these theories, any reasonable attorney would expect that if the jury found Mendez not guilty of murder and attempted murder, but instead guilty of being only an accessory after the fact, then it also would have found him not guilty of conspiring to commit murder.  Indeed, it was not until it became clear through jury questions that the jury was struggling with the murder counts that anyone recognized the possibility of this unusual conclusion to the trial.

Mendez has not cited, and we could not locate, any authority for the proposition that defense counsel, or any attorney for that matter, is required to anticipate all possible issues, no matter how unlikely.  Indeed, a criminal defendant is not entitled to a perfect trial, but merely a fair trial.  (See, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1009, and the cases cited therein.)  While in a perfect world trial counsel might have anticipated the jury's verdict, we conclude that when we apply an objective standard of reasonableness under prevailing professional norms, it is clear that defense counsel was not ineffective for failing to do so.

Second, review of admissible evidence in the record leads to the inescapable conclusion that Mendez cannot establish he was prejudiced by the failure of counsel to request a conspiracy-to-be-an-accessory-after-the-fact instruction.  As explained above, the trial was presented to the jury on the theory that Mendez was an active participant in the conspiracy to murder DeAngelo and J.S.  The information charged Mendez with conspiracy to commit murder.  The prosecutor's opening statement and closing statements urged the jury to find Mendez guilty of conspiracy to murder DeAngelo and J.S.  The jury instructions informed the jury that Mendez was charged with conspiracy to murder DeAngelo and J.S. and then explained the elements that the jury must find beyond a reasonable doubt to reach a guilty verdict.

The jury also questioned the trial court about the verdict form during deliberations and received appropriate clarifying instructions from the trial court. This demonstrates the jury carefully considered the verdict form and the instructions. At no time, however, did the jury ever express any doubt to the trial court about the conspiracy count.

Each of these facts establishes the jury conscientiously followed the jury instructions and reached the verdict it thought appropriate after hearing all of the evidence and the argument of counsel. We conclude these facts lead to the inescapable conclusion that it is not reasonably probable Mendez would have obtained a better result if the jury had received an instruction on conspiracy to be an accessory after the fact.

## VI.  Trial Court's Failure to Clarify the Verdict Before Discharging the Jury

In this argument Mendez attacks the verdict by asserting the trial court erred when it failed to clarify the verdict form before discharging the jury. Resolution of this argument again requires a detailed recitation of the events that occurred during deliberations.

After deliberations began, the jury requested and received a copy of the jury instructions. The jurors also listened to Mendez's police interview at their request and received the evidence of the phone calls that were introduced into evidence. The jury also asked that the poster board that was used by the prosecution in opening argument that apparently listed the charges be sent into the jury room. This request was denied because the presentation did not include the accessory-after-the-fact charges. Instead, the trial court instructed the jury to "Consult jury instructions and/or verdict forms."

The fourth communication from the jury posed a question to the trial court about the accessory-after-the-fact charge. The jury asked, "Does the alternate theory 446 accessory after the fact … stand alone without Count One, first degree/second degree? Judge can you come in to clarify?" After lengthy discussions between the trial court and counsel about the appropriate response, the trial court instructed the jury to reread the

specific instruction dealing with the accessory counts, and also informed the jury that if the instruction did not resolve the confusion, it should send out another written question.

The first response did not resolve the jury's confusion. The following day the jury sent the following question to the trial court: "After thoroughly reading the instructions regarding first degree, second degree, and the alternative theory, our question/confusion stands on page 35. In our understanding, No. 3 and No. 5 contradict one another. If a jury were to find not guilty on first degree and not guilty on second degree, is the alternative theory completely out the window? Is it still an option?"

The reference to Nos. 3 and 5 in the question referred to the verdict forms. After a lengthy discussion, the trial court decided to respond to the question with a simple "No" to the first question (is the alternative theory completely out the window) and "Yes" to the second question (is it still an option). The trial court did note for the first time that there was a potential inconsistent verdict if the jury found Mendez not guilty of murder, guilty of being an accessory after the fact, and guilty of conspiracy to commit murder.

The jury asked another question the following day: "Does the law state that the driver of the vehicle involved in a crime is as guilty as the shooter?" The trial court referred the jury to the aiding and abetting instructions. Approximately four hours later, the jury informed the trial court that it had reached a verdict.

When the jury was brought back into the courtroom, the trial court confirmed with the foreperson that a verdict had been reached and then examined the verdict form completed by the jury. The trial court then ordered the jury back to the deliberation room because of a possible "inconsistent verdict." The trial court then went into chambers to do research on the issue and eventually invited both counsel into chambers to discuss the issue. When the trial court and the attorneys returned to the courtroom, each party was permitted to summarize its arguments for the record. The prosecution essentially argued that case law permits inconsistent verdicts and the existence of an inconsistent verdict did not establish jury confusion.

Defense counsel pointed out that the verdict form stated Mendez was guilty of conspiracy to commit a crime, not conspiracy to commit murder, and therefore further argument and instruction was required, along with further deliberations and a different verdict form. Defense counsel concluded that "unless this Court is prepared to sentence Mr. Mendez to the punishment for conspiracy to commit a murder—and the Court knows what the sentence is—that the Court should not simply interlineate the word 'murder' in that verdict form. We should find out from this jury if that's -- if that's their intention to convict this man of that crime."

The trial court concluded that because the verdict form was consistent with the information, and the entire case had been tried on the theory that Mendez was accused of conspiracy to commit murder, there was "no need to alter that [verdict] form and send it in or ask for re-argument or anything else." The trial court also opined that the jury may have concluded Mendez conspired to murder a different individual other than the actual victims, and therefore the verdict was not inconsistent. The verdict was then recorded after the jury returned to the courtroom.

Mendez cites section 1138 as authority for his argument that the trial court erred when it failed to obtain clarification from the jury about the verdict on the conspiracy charge. This section states:

> "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

This section has been interpreted to require the trial court to resolve any instructional confusion expressed by the jury, which is consistent with the trial court's duty to help the jury understand the legal principles in the case. (*People v. Giardino* (2000) 82 Cal.App.4th 454, 465.) Thus, "When a jury makes explicit its difficulties

40.

[understanding the jury instructions,] a trial judge should clear them away with concrete accuracy." (*Bollenbach v. United States* (1946) 326 U.S. 607, 613-614.)

While these principles are well established, they do not aid Mendez because the jury never expressed any confusion about the conspiracy charge. Mendez focuses on the issues the jury had with the murder counts and the accessory-after-the-fact counts to theorize that "the jury was confused regarding the legal principles it was being asked to apply." Mendez goes on to theorize the jury may have concluded he was guilty of conspiring to be an accessory after the fact.

While we agree the issue could have been, and perhaps should have been, resolved by obtaining a clarification from the jury about the target crime of the conspiracy count, the failure to do so did not implicate section 1138 or the trial court's duties because the jury never expressed any confusion about the jury instructions relating to the conspiracy count. The trial court responded to each of the questions posed by the jury in an appropriate manner and thus did not violate the requirements of section 1138, or any other authority of which we are aware.

## VII. Remaining Contentions

In the first of his final two arguments, Mendez asserts he can be convicted only of one count of being an accessory after the fact since, as a matter of law, he violated section 32 only one time. (*People v. Perryman* (1987) 188 Cal.App.3d 1546, 1549; see *People v. Mitten* (1974) 37 Cal.App.3d 879, 884.) The People concede that argument has merit, as do we. Mendez's actions that constituted being an accessory after the fact occurred only one time and thus can constitute only one crime. Accordingly, one of the accessory counts must be reversed.

The final argument made by Mendez is that the gang enhancement pursuant to section 186.22, subdivision (b)(5) must be stricken because the trial court also imposed a gun use enhancement pursuant to section 12022.53, subdivision (e). Section 12022.53, subdivision (e)(2) prohibits the imposition of a criminal street gang enhancement "in

41.

addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." The People concede Mendez did not use or discharge a firearm, so the enhancement was improperly imposed.

## CONCLUSION

The majority of Mendez's brief challenges a verdict form that clearly was ambiguous. Although we have rejected each of his challenges, all of these issues could have been avoided had the trial court simply obtained clarification from the jury. The ambiguity was discovered before the jury was discharged and the more prudent course would have been to obtain clarification from the jury.

## DISPOSITION

One count of violation of section 32 is reversed, and the gang enhancement imposed on count 3 is vacated. The judgment is affirmed in all other respects. The matter is remanded to the trial court with directions to prepare a new abstract of judgment and to forward a copy of same to the appropriate agencies.

_____
CORNELL, Acting P.J.

WE CONCUR:

_____
GOMES, J.

_____
PEÑA, J.