[No. A111633. First Dist., Div. One. Feb. 11, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY CALVIN, Defendant and Appellant.

COUNSEL

Meredith J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Dorian Jung, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARGULIES, J.**—Defendant was tried for assault with a firearm and battery. During jury selection, the prosecutor exercised peremptory challenges to dismiss four of six African-American potential jurors. In response, defendant moved to discharge the jury panel, contending that the prosecution's dismissals were racially motivated. After the prosecutor justified the peremptory challenges in part by reference to the jurors' skeptical attitudes toward the criminal justice system, the trial court denied the motion, finding no discriminatory motive.

Defendant argues that skepticism toward the criminal justice system is so prevalent among African-Americans that it should be considered a proxy for race and that, as a result, peremptory challenges based on such an attitude should be deemed discriminatory. We disagree and affirm.

## I. BACKGROUND

Defendant was charged in an amended information with assault with a firearm (Pen. Code,[1] § 245, subd. (a)(2)), being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and battery with serious bodily injury (§ 243, subd. (d)). As to the assault count, the information alleged that defendant had personally inflicted great bodily injury and personally used a firearm.

---

[1] All statutory references are to the Penal Code.

(§§ 12022.7, subd. (b), 12022.5, subd. (a).) The information also alleged that defendant had suffered 10 prior strike convictions (§§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A)) and 10 prior serious felony convictions (§ 667, subd. (a)(1)), and had served 10 prior prison terms (§ 667.5, subd. (b)).

The evidence demonstrated that defendant, acting from romantic jealousy, had pistol-whipped another man and inflicted disabling head injuries.[2] The jury found defendant guilty on all three counts, and the trial court found true the prior convictions and prison term enhancement allegations. Defendant was sentenced to a term of 40 years to life.

## II. DISCUSSION

Defendant contends that the People used peremptory challenges to remove four African-American potential jurors from the jury panel solely on the basis of race in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).

### A. *Procedural Background*

After excuses for hardship, the jury panel consisted of 68 persons, six of whom were African-Americans. Five of these jurors were dismissed by peremptory challenge, four by the prosecution and one by the defense. The sixth African-American juror was seated as the third alternate.

Following the prosecution's peremptory dismissal of the first three African-American jurors, Prospective Jurors Nos. 84, 49, and 7, defendant moved to discharge the jury panel under *Batson* and *Wheeler*, contending that the prosecution's challenges were racially motivated. The trial judge initially concluded that defense counsel had not made a prima facie case of group-based discrimination, but he reversed this ruling after the prosecutor disclosed his intention to dismiss a fourth African-American panel member, Prospective Juror No. 39, who was next in line to be seated. As required by *Batson* and *Wheeler,* the judge then asked the prosecutor to justify his peremptory challenges.

---

[2] We have not provided further details of defendant's crime because the single issue raised on appeal does not depend upon them.

The prosecutor said that he exercised a peremptory challenge to Prospective Juror No. 84 because the juror "indicated that the criminal justice system is not fair for Black people, and that if you can't pay for a good attorney, the criminal justice system is not fair. . . . Blacks are accused wrongfully, get convicted because they don't know their rights or the system or have the means to hire an attorney. . . . [H]e indicated that he had concerns about being fair and impartial."

The prosecutor's opinion was based in part on the juror's response to a question in the juror questionnaire that asked, "What are your feelings about the fairness and effectiveness of the criminal justice system?" In response, the juror had written, "I think that if you can't pay for a good attorney the justice system is not that good. Criminal justice system is not that fair for Black people sometimes." The juror confirmed these views during voir dire. When the prosecutor asked, with respect to the defendant, "You feel in society whether he's African-American, [he's] more likely to be [found] guilty in this place [i.e., the court] . . . ," the juror responded, "Definitely not a plus." Because of his concern with the ability of poor defendants to secure adequate legal representation, Prospective Juror No. 84 stated that he would "consider the quality of the defense attorney" in reaching his verdict, a response that caused the court to question him at length.

The prosecutor explained that he excused Prospective Juror No. 49 because he was concerned this juror was biased against the police "and the People feared that bias might carry over into the prosecution, especially since it sounds like [the defense is] pointing the finger at the officers and their investigation." The prosecutor was also concerned that the juror "had concerns about the credibility of individuals who were addicted to drugs," which was important because the victim, a primary witness at trial, had used marijuana on the day of the assault.

On the questionnaire, Prospective Juror No. 49 stated that her younger brother had been murdered. In response to the question asking her views on the criminal justice system, she stated, "It doesn't always seem to work. For example the guy who killed my brother was set free by the jury to roam the streets to kill again." The juror also noted that if she learned a witness used drugs, "Maybe find that person credibility somewhat alter [sic]." In response to a question asking for general comment, the juror wrote, "I feel that the police department especially Oakland doesn't do a thorough job of investigating African-American people['s] murder or death, they let [too] much evidence go by the [wayside]." The juror's responses during voir dire generally confirmed these views.

The next juror discussed, Prospective Juror No. 7, noted in her questionnaire that drug use might cause her to question a witness's credibility. She later told the court that her husband had legal problems as a result of drug use. She was in the process of divorcing the man, who "because of this problem, he lies a lot." She confirmed that she would doubt the credibility of a current drug user. The prosecutor said that, "for the same reason [as Prospective Juror No. 49], the People had concerns that someone had—someone in her life that was a substance abuser. And in her voir dire, she called him a liar . . . ." This juror also expressed some skepticism about the criminal justice system, although the prosecutor did not cite this skepticism as a ground for challenging her.

The prosecutor stated that the final juror, Prospective Juror No. 39, "indicated that he, too, believed that money gives a good chance of winning in the criminal justice system. He also stated that he believed he was the victim of racial profiling, and believes racial profiling occurs in our system. When asked if he had some concerns that the Defendant in this case was African-American, he paused before he answered, and stated that probably not, but the People weren't convinced by his answer because of that pause and because of his previous answer." The prosecutor was also concerned that the juror had "misgivings" about the music industry, which was a matter of concern because defendant and the victim were both professional musicians.

This juror's responses supported the prosecutor's concerns. Asked his view of the criminal justice system in the questionnaire, the juror responded, "If you have money you have a good chance of winning." During voir dire, he confirmed that his view of whether the defense attorney performed well might affect his evaluation of the evidence. The juror also related that when he owned a motorcycle while living in Maryland, he was frequently stopped by police and that he had been stopped a few times in the Bay Area without good reason. He attributed the stops to "driving while Black." While working within the music industry, Prospective Juror No. 39 had formed the opinion that "[s]ome people . . . in the music industry, their credibility is not good. . . . That's a really cutthroat business. . . . So what some people do to survive is just, like, not good."

The court was persuaded that the prosecutor had stated race-neutral reasons for challenging the four jurors and that the prosecutor had exercised the challenges for nondiscriminatory reasons. Accordingly, defendant's *Batson-Wheeler* motion was denied.

B. *Applicable Law*

In *Batson,* the United States Supreme Court held that the exercise of a peremptory challenge for a discriminatory purpose offends equal protection under the Fourteenth Amendment. (*Batson, supra,* 476 U.S. at p. 89.) Years earlier, the California Supreme Court in *Wheeler* held that such conduct violated the state Constitution's guarantee of a trial by a jury drawn from a venire representative of the community. (See *People v. Huggins* (2006) 38 Cal.4th 175, 226 [41 Cal.Rptr.3d 593, 131 P.3d 995].) A prosecutor is presumed to exercise peremptory challenges in a manner conforming to these constitutional requirements. (*People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Thus, a defendant seeking to challenge a prosecutor's peremptory challenge on these constitutional grounds first must raise a timely objection and must show that the relevant circumstances give rise to an inference that the objectionable challenge was purposefully discriminatory. Second, if a defendant makes this prima facie showing, the burden shifts to the prosecutor to provide permissible race-neutral justifications for the peremptory challenge. Finally, the trial court must then determine whether the defendant has proved that the objectionable challenge was based on purposeful discrimination. (*Huggins,* at pp. 226–227.) The prosecutor may exercise a peremptory challenge for any permissible reason, or for no reason at all, but if he or she provides an " 'implausible or fantastic' " justification for a peremptory challenge, the trial court may deem that justification to be a pretext for purposeful discrimination. (*Id.* at p. 227.)

C. *Analysis*

Defendant contends that the prosecutor's reliance on the skeptical attitudes of the African-American jurors toward the criminal justice system in exercising his peremptory challenges was not race neutral because such attitudes are so widespread among African-Americans as to constitute a surrogate for race.

To support his contention that such attitudes are widespread among African-Americans, defendant relies in large part on the answers the jurors provided on the juror questionnaire to the question, "What are your feelings about the fairness and effectiveness of the criminal justice system?," which defendant labels the "suspect question." According to defendant, the belief that wealthy defendants have an advantage was expressed by several jurors, not just the African-American jurors cited above. However, other types of critical comments were much more common among African-American jurors. Defendant argues that five of the six African-Americans in the panel were critical of the criminal justice system, while far less than a quarter of

the remaining panel members, from a wide range of other racial and ethnic backgrounds, expressed that attitude. Defendant further argues that the prevalence of these attitudes among African-Americans is a realistic response to racially discriminatory conduct by police officers and to the disproportionate rates of incarceration for African-Americans in the United States, and California in particular. Because of the prevalence of this attitude among African-Americans, defendant argues, the expression of these views cannot constitute a "race-neutral" ground for the exercise of peremptory challenges under *Batson* and *Wheeler.*

Before addressing defendant's argument, we note that, due to the small sample size and a lack of statistical analysis, the juror questionnaire responses cannot conclusively demonstrate that critical attitudes toward the criminal justice system are more common among African-Americans than other racial and ethnic groups. Further, as to three of the four jurors, the prosecutor stated an additional reason for challenge that had nothing to do with attitudes toward the criminal justice system—the jurors' views on the credibility of drug users and musicians. The remaining juror was challenged in part because he believed that poor defendants are at a disadvantage, a belief that defendant concedes is not strongly associated with race. Accordingly, even if skeptical attitudes toward the criminal justice system are not a race-neutral basis for challenge, the prosecutor could nonetheless be found to have expressed a race-neutral ground for dismissing each of the African-American jurors.

These reservations notwithstanding, we address defendant's argument on its merits, assuming for purposes of argument that the skeptical attitudes displayed by the challenged jurors are widespread among African-Americans and less common among other racial and ethnic groups and that it was these attitudes that motivated the prosecutor in dismissing the jurors.

■ Defendant contends that the prosecutor's reliance on the jurors' attitudes toward the criminal justice system fails the test for race neutrality. The closest Supreme Court authority is *Hernandez v. New York* (1991) 500 U.S. 352 [114 L.Ed.2d 395, 111 S.Ct. 1859] (*Hernandez*), in which a prosecutor exercised peremptory challenges to two bilingual Hispanic jurors in a trial featuring Spanish-speaking witnesses because the jurors expressed some hesitation about accepting the court interpreter's translations as authoritative. (*Id.* at p. 356.) On the issue of race neutrality, the court noted, "A court addressing this issue must keep in mind the fundamental principle that

'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.' [Citation.] ' "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision-maker . . . selected . . . a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.' [Citations.]" (*Id.* at pp. 359–360.) In contrast, "[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Id.* at p. 360.)

The defendant argued that the prosecutor's articulated reason was not race neutral because "Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish." (*Hernandez, supra,* 500 U.S. at p. 360.) The court rejected this interpretation, concluding that the prosecutor's challenges "rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals." (*Id.* at p. 361.) Rather, the prosecutor's challenge was based on the jurors' expressed hesitation in accepting the official interpreter's translations as authoritative. "While the prosecutor's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause." (*Ibid.*)

The defendant argued that reliance even on such hesitation "has the effect of a pure, language-based reason because . . . a bilingual juror would hesitate in answering questions like those asked by the judge and prosecutor due to the difficulty of ignoring the actual Spanish-language testimony." (*Hernandez, supra,* 500 U.S. at pp. 361–362.) The court found the argument unpersuasive: "[E]ven if we knew that a high percentage of bilingual jurors would hesitate in answering questions like these and, as a consequence, would be excluded under the prosecutor's criterion, that fact alone would not cause the criterion to fail the race-neutrality test. . . . Equal protection analysis turns on the intended consequences of government classifications. Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality. Nothing in the

prosecutor's explanation shows that he chose to exclude jurors who hesitated in answering questions about following the interpreter *because* he wanted to prevent bilingual Latinos from serving on the jury." (*Id.* at p. 362.)

 The situation here is very similar. We have assumed for the purpose of argument that the attitudes reflected in the jurors' questionnaire responses are common among African-Americans and that rejecting jurors on these grounds will disproportionately exclude African-Americans as jurors. Yet that fact alone does not mean that the challenges fail the test for race neutrality. As our Supreme Court has noted, skepticism about the fairness of the criminal justice system is a valid ground for excusing jurors. (E.g., *People v. Gray* (2005) 37 Cal.4th 168, 192 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Turner* (1994) 8 Cal.4th 137, 171 [32 Cal.Rptr.2d 762, 878 P.2d 521], overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5 [15 Cal.Rptr.3d 743, 93 P.3d 344] ["We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement."]; *People v. Walker* (1988) 47 Cal.3d 605, 625–626 [253 Cal.Rptr. 863, 765 P.2d 70].) Prosecutors are understandably concerned about retaining such persons on criminal juries. Further, while we have assumed that such attitudes predominate among African-Americans, they are neither inevitable among African-Americans nor restricted to them. Every racial and ethnic group can contain persons who have had unpleasant experiences with law enforcement that have caused them to form an unfavorable view of the criminal justice system, or who have formed such views for other reasons. At the same time, as one African-American juror in this panel demonstrated, there are African-Americans who have not formed such views. Because such skepticism, regardless of its prevalence among African-Americans, is not exclusively associated with their race and constitutes a plausible basis for challenge, there is nothing "inherent" in the criterion that suggests *intentional* racial discrimination. (*Hernandez, supra,* 500 U.S. at p. 360.)

Indeed, our Supreme Court has already rejected defendant's argument, although briefly and without extensive discussion. In *People v. Avila* (2006) 38 Cal.4th 491 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (*Avila*), the court considered a *Wheeler* challenge. The husband of one of the potential jurors, an African-American, had been prosecuted and, later, had been the victim of a carjacking. The experiences had caused the juror to conclude that "everyone lies," including the police. (*Avila,* at pp. 543–544.) The prosecutor discharged her in part on the basis of this belief, noting that he did not want the juror "infect[ing]" the jury with her personal experiences. (*Id.* at p. 544.) The defendant contended that the challenge constituted a *Wheeler* violation "because members of racial minority groups are generally arrested more often and on less evidence than White individuals and thus tend to distrust police officers more than others." (*Avila,* at p. 545.) The court rejected the argument,

reasoning that "[t]he prosecutor's challenge to [the juror] was based on her *personal experience* that police officers lied, not on a theoretical perception that she, a member of a minority group, might view the police with distrust." (*Ibid.*) In the same way, the prosecutor below discharged the four African-American jurors on the basis of their individual responses, not on the basis of attitudes he imputed to them as a consequence of their race.

Defendant relies heavily on *U. S. v. Bishop* (9th Cir. 1992) 959 F.2d 820 (*Bishop*), but the comparison with *Bishop* highlights just the distinction drawn by our Supreme Court in *Avila*. In *Bishop,* the prosecutor had peremptorily challenged an African-American juror about whom little was known other than that she lived in Compton, a predominantly African-American neighborhood of Los Angeles. (*Id.* at p. 822.) When asked to justify his challenge, the prosecutor responded that "he felt that an eligibility worker in Compton 'is likely to take the side of those who are having a tough time, aren't upper middle class, and probably believes that police in Compton in South Central L.A. pick on black people. [¶] To some extent the rules of the game down there are probably different than they are in upper middle class communities. And they probably see police activity, which is, on the whole, more intrusive than you see in communities that are not so poor and violent.' " (*Ibid.*)

The court acknowledged that the attitudes attributed to the juror by the prosecutor might have constituted good grounds for a peremptory challenge *if they had actually been demonstrated to exist.* Instead, they were merely assumed on the basis of the juror's race. "For example, her responses to certain questions might have given rise to the prosecutor's impression. In contrast, the proffered reasons (that people from Compton are likely to be hostile to the police because they have witnessed police activity and are inured to violence) are generic reasons, group-based presuppositions applicable in all criminal trials to residents of poor, predominantly black neighborhoods. They amounted to little more than the assumption that one who lives in an area heavily populated by poor black people could not fairly try a black defendant. [¶] To strike black jurors who reside in such communities on the assumption they will sympathize with a black defendant rather than the police is akin to striking jurors who speak Spanish merely because the case involves Spanish-speaking witnesses. . . . [¶] The prosecutor's justification in this case, unlike in *Hernandez,* referred to collective experiences and feelings that he just as easily could have ascribed to vast portions of the African-American community. . . . Ultimately, the invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes. [Citation.] Government acts based on such prejudice and stereotypical thinking are precisely the

type of acts prohibited by the equal protection clause of the Constitution. [Citation.]" (*Bishop, supra*, 959 F.2d at pp. 825–826.)[3]

If the prosecutor here had dismissed the African-American jurors based on his *assumptions* about their attitudes, he would have demonstrated the type of group-based discrimination outlawed by both the equal protection clause and the California Constitution's guarantee of a trial by a jury drawn from a representative cross-section of the community. He did not. The prosecutor reviewed the questionnaires submitted by these jurors and questioned the jurors closely. The skeptical views for which he challenged them were not a result of prosecutorial assumptions but were actually expressed by the jurors themselves. The fact that similar attitudes are held by many other African-Americans does not convert the prosecutor's challenge into intentional race-based discrimination. (See similarly, *Avila, supra*, 38 Cal.4th at p. 545; *U. S. v. Fike* (5th Cir. 1996) 82 F.3d 1315, 1320, overruled on other grounds in *United States v. Brown* (5th Cir. 1998) 161 F.3d 256, 259, fn. 8 ["*Batson* does not forbid striking a juror who holds a particular opinion about the U.S. justice system. . . . [¶] . . . [The juror's] stated concern about the justice system removes the specter of generic reason or group based presumption."])

Defendant also contends that the trial court erred in concluding that the prosecutor's peremptory challenges to Prospective Jurors Nos. 84 and 39 survived the third step of the *Batson-Wheeler* analysis, the factual determination of purposeful discrimination. We apply a more deferential standard of review to the trial court's step three evaluation. "[T]he trial court is in the best position to determine whether a given explanation is genuine or sham." (*People v. Fuentes* (1991) 54 Cal.3d 707, 720 [286 Cal.Rptr. 792, 818 P.2d 75].) Therefore, when the trial court has engaged in a sincere and reasoned attempt to evaluate the stated reasons offered for the exclusion of each challenged juror, we accord great deference to its rulings that the prosecutor's stated reasons are genuine, reviewing them under the substantial evidence standard. (*People v. Jurado* (2006) 38 Cal.4th 72, 104–105 [41 Cal.Rptr.3d

---

[3] The other case cited by defendant on this issue, *People v. Van Hoesen* (N.Y.App.Div. 2003) 307 A.D.2d 376 [761 N.Y.S.2d 404] rested on essentially the same grounds. The juror commented in her questionnaire, "As an African-American female there are some I don't want to say biases, but there are some things that growing up that I have seen, I have heard but that's who I am. I put the facts in front of me and I will weigh the facts." (*Id.* at pp. 405–406.) It was based on this response that the prosecutor challenged the juror. The court concluded that "The prosecutor's stated reason for the peremptory challenge presumes that the juror's African-American background would lead her to favor defendant or otherwise impair her impartiality in weighing the evidence. There is, however, nothing in the juror's actual comments to suggest that her particular life experience as an African-American would improperly bias her in favor of defendant or against the prosecution." (*Id.* at p. 406.) The prosecutor here did not rely on the jurors' race but on their articulated attitudes.

319, 131 P.3d 400]; *People v. Silva* (2001) 25 Cal.4th 345, 385–386 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

The prosecutor told the court that he challenged Prospective Juror No. 84 because the juror believed that poor criminal defendants are at a disadvantage and suggested that this belief might affect his weighing of the evidence. This reasoning was supported by the juror's responses to the jury questionnaire and voir dire questions. Defendant argues that Prospective Juror No. 84's doubts about the criminal justice system grew out of his experiences as an African-American, and for that reason his dismissal on the basis of those doubts embodied group bias. This is simply a restatement of defendant's argument, which we rejected above, that doubts about the criminal justice system are not a race-neutral basis for dismissal.[4] Prospective Juror No. 84's comments about the criminal justice system constituted substantial evidence supporting the court's conclusion that the juror's dismissal was based on genuine race-neutral reasons.

The prosecutor told the court that he challenged Prospective Juror No. 39 because the juror believed that poor defendants are at a disadvantage, had been the victim of racial profiling, and had doubts about the credibility of persons who worked in the music industry. Defendant contends that the prosecutor's reliance on racial profiling was not a race-neutral basis for dismissal because "[o]nly a Black person can be the victim of racial profiling." He also argues that the prosecutor's citation of the juror's remarks about musicians was a sham, since both defendant and the victim were musicians. It is not true that only African-Americans can be victims of racial profiling, yet even if it were, for the reasons discussed above, this would not mean that the prosecutor's reliance on this characteristic was impermissible. Again, defendant is merely reasserting his second step arguments. Nor is there any reason to believe that the prosecutor's reliance on the juror's remarks about musicians was a sham, since any prior negative experience with musicians might understandably concern the prosecutor. The juror's responses constituted substantial evidence supporting the trial court's determination that this juror was not excused for racially discriminatory reasons.

---

[4] Defendant also argues that two non-African-American jurors were retained despite holding similar concerns about the advantages of wealth in the criminal justice system. Overlapping responses alone are not enough to demonstrate purposeful discrimination. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1020 [47 Cal.Rptr.3d 467, 140 P.3d 775].) To prove such a claim, a defendant must engage in a careful side-by-side comparative analysis to demonstrate that the dismissed and retained jurors were "similarly situated." (E.g., *id.* at pp. 1016–1024.) Defendant does not even attempt such a comparison, but merely notes the overlapping responses. Accordingly, we do not consider this argument further.

## III. DISPOSITION

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 21, 2008, S162017.