Filed 7/16/15  P. v. Corzo and Figueroa CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254650 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County<br> Super. Ct. No. LA070082) |
| BRONCO CORZO and<br>BRIAN FIGUEROA, | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Martin L. Herscovitz, Judge.  Affirmed.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant Bronco Corzo.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant Brian Figueroa.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Roberta L. Davis and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants and appellants Bronco Corzo and Brian Figueroa of the second degree murder of Justin Dunlap. (Pen. Code, § 187, subd. (a).)[1] The trial court found true allegations that appellants suffered one prior strike each. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) The court sentenced appellants to terms of 30 years to life each. Appellants challenge their convictions on several grounds. They contend the jury instruction on voluntary intoxication improperly precluded the jury from considering evidence of their intoxication as it related to their defenses of heat of passion and imperfect self-defense. Figueroa challenges the denial of his *Wheeler/Batson* motion. (*People v. Wheeler* (1978) 22 Cal.3d 258, overruled in part by *Johnson v. California* (2005) 545 U.S. 162; *Batson v. Kentucky* (1986) 476 U.S. 79.) Figueroa also challenges the trial court's finding that the prosecution exercised due diligence in attempting to procure a witness's attendance at trial. Corzo contends that the evidence is insufficient to sustain his conviction and that he was denied the effective assistance of counsel. We find none of appellants' contentions meritorious and affirm both convictions.

## BACKGROUND

*Prosecution Evidence*

On February 1, 2012, around 6:00 p.m., J.D. Kelley was walking through a park in Sherman Oaks on his way to a store.[2] Kelley saw two Hispanic men, later identified as appellants, fighting with Dunlap.[3] Dunlap was disoriented and trying

---

[1]     All undesignated statutory references are to the Penal Code.

[2]     Kelley's preliminary hearing testimony was read at trial because he was found by the trial court to be unavailable.

[3]     Kelley identified appellants in "field showups" conducted by the police.

to get to his feet while appellants kicked and punched him.  One of the Hispanic men was holding a crowbar.  He approached Kelley and said, "What's up?"  Kelley told him to go home and said he would "trash" appellants if they did not.  Appellants spoke to each other in Spanish and started backing away.  Kelley continued walking to the store.

James Uloth and Mark Fry were walking through the park on February 1, 2012, around 6:00 p.m.  They saw an African American man, later identified as Dunlap, walking toward them.  They thought Dunlap was drunk or homeless, so they avoided him.

After passing Dunlap, Uloth and Fry heard shouting behind them.  They turned around and saw appellants attacking Dunlap.  Appellants were punching and kicking Dunlap in the head and chest.  Uloth and Fry started to go closer to stop them when they saw appellants take out a crowbar.  One of them used the crowbar to strike Dunlap in the head while the other kicked Dunlap.  Dunlap fell to the ground and tried to protect himself, but one of the men sat on Dunlap and continued to punch him in the face.  Uloth estimated that they struck Dunlap between 24 and 50 times.

Appellants began to walk away toward a girl who had been yelling that they needed to go.  Dunlap lay motionless on the ground.  One of the appellants ran back and struck Dunlap six to 12 more times.

Uloth called 911 when he saw appellants take out the crowbar.  After appellants left, Uloth, a former paramedic, tried to help Dunlap, who was bleeding profusely and had a severe brain injury.

Los Angeles Police Officers Anthony Lopez and Cesar Corona heard the call about the assault.  They saw Corzo walking down the middle of the street and asked if they could speak with him.  Corzo placed his hands on top of his head and

3

replied, "I know why you're here. Let's get this over with." Corzo told Officer Lopez that Dunlap "tried to buy my homeboy's girlfriend and I just started socking that fool. I think I knocked him out with the first punch." Corzo stated that he "picked up a pipe and started hitting [Dunlap]. [Corzo] said he thought he 'killed that fool,' and . . . 'I hope I killed that black piece of shit.'" Officer Lopez smelled alcohol on Corzo's breath, but Corzo "spoke clearly and he stood straight." Corzo did not state that Dunlap attacked him. Corzo had blood, abrasions, and swelling on his left hand, but no other injuries.

Officer Scott Nunez and his partner saw Desiree Estrada and Figueroa walking on the sidewalk and stopped to speak to them. Figueroa was carrying a bottle of tequila and smelled of alcohol. He had some dried blood on his shirt but no visible injuries.

Dunlap died from blunt force trauma to his head. He suffered multiple lacerations and contusions, and the left side of his skull was depressed with multiple fractures from being struck numerous times. Dunlap also had contusions on his body from being kicked and punched. He had bruises on his forearms from trying to protect himself, but no contusions on his hands that would have indicated he struck someone. Dunlap had marijuana and alcohol in his system.

*Defense Evidence*

1.     *Character Evidence Regarding Dunlap*

On November 18, 2009, off-duty Los Angeles County Sheriff Sergeant Valerie Silgero and her husband, Allen Dollens, also a sergeant, were at a gas station with their children. Sergeant Dollens saw Dunlap thank someone at a nearby gas pump. When Dunlap approached Sergeant Dollens, Sergeant Dollens thought Dunlap was panhandling, so he told Dunlap to leave his family alone.

4

Dunlap became angry and told Sergeant Dollens he did not want money but wanted a ride. Dunlap used profanities and continued to argue even after Sergeants Silgero and Dollens identified themselves as officers and pointed their weapons at him. Dunlap ran into the gas station. Sergeants Silgero and Dollens chased Dunlap and apprehended him inside the gas station. Dunlap held his hands up and said, "I'm not playing anymore. I don't want any more."

Estrada was at the park with appellants on the evening of the assault.[4] Dunlap approached them and asked how they were doing. Estrada described Dunlap as "weird" and drunk. Estrada and Corzo went to use a restroom in a local restaurant while Figueroa stayed at the park with Dunlap. When Estrada and Corzo returned, she saw Dunlap try to hit appellants. Appellants "tried to defend themselves."

### 2. *Expert Testimony*
#### a. *Corzo*

Corzo presented evidence regarding the effect of a blood alcohol level as high as Dunlap's at the time of his death, which was approximately .35 percent. The expert testified that most people at that level would be unconscious, but it might be possible for someone with a high alcohol tolerance to "walk around and throw punches."

Corzo, who was 19 years old at the time of trial, presented expert testimony about risky behavior and low impulse control in adolescents, as well as evidence that alcohol impairs judgment and can lead to an increase in reckless behavior.

---

[4] Estrada was found to be unavailable, so her preliminary hearing testimony was read at trial.

Dr. Andrea Bernhard, a psychologist, testified that Corzo suffered from substance abuse issues, depression, and a history of trauma based on his father's violent behavior. Until Corzo was six years old, his father lived with him and beat up Corzo's mother when he became drunk. Dr. Bernhard testified that this experience triggered an instinctive reaction in Corzo to protect his loved ones.

### b. *Figueroa*

Dr. Kevin Booker, a trauma specialist, testified that Figueroa suffered from post-traumatic stress disorder from being assaulted at the age of 16 and from witnessing a good friend being shot and murdered. Figueroa was hypervigilant as a result, which meant he overreacted to situations.

### 3. *Corzo's Testimony*

Corzo testified that his father beat him, his mother, and his brother until he was about six years old. He started drinking alcohol when he was 10 years old and using drugs when he was 11 years old. In the summer of 2011, Corzo was arrested after he took someone's skateboard and hit him with it.

Corzo claimed that on the morning of the offense, he and Figueroa drank two 18-packs of beer in 30 minutes and "some 40-ouncers" of beer before going to the park with Estrada. They smoked marijuana and drank gin when they arrived at the park.

Dunlap arrived with a bottle of tequila, introduced himself, and sat down and started drinking with them. Dunlap asked Corzo if Estrada was his girlfriend and offered to "buy her." Corzo accompanied Estrada to the restroom and when they returned a few minutes later, Dunlap and Figueroa were fighting. Corzo testified that Figueroa was "getting beat up." Dunlap swung a pipe at Corzo, so Corzo

6

grabbed it and hit Dunlap with it. Corzo hit Dunlap repeatedly after he fell to the ground to ensure that he did not get up. After walking away with Figueroa and Estrada, Corzo ran back and hit Dunlap with the pipe again because he thought Dunlap still posed a threat, even though he was lying on the ground not moving. Corzo testified that the pipe was heavy and that he struck Dunlap in the head about 10 times.

### 4. *Figueroa's Testimony*

Figueroa was 20 years old at the time of trial and 18 years old at the time of the offense. He testified that he became somewhat paranoid after he was assaulted at the age of 16. Figueroa also testified about the skateboard incident in the summer of 2011, stating that Corzo took the victim's skateboard and hit him in the face with it.

Similar to Corzo, Figueroa testified that on the day of the offense, they drank two 18-packs of beer, smoked marijuana, and drank gin. Dunlap approached Figueroa, Corzo, and Estrada in the park, introduced himself, and said he "wanted to hang out" with them. After Estrada and Corzo went to the restroom, Dunlap asked Figueroa if he could "buy" Estrada. Figueroa became angry and told Dunlap to "get the fuck out of here." Dunlap became angry and punched Figueroa. Figueroa punched him back but then tried to walk away. Dunlap followed him and continued punching him. Dunlap tried to hit him with a metal pole, but Corzo grabbed it. Figueroa told Corzo to relax, but Dunlap continued to try to hit them, even after Corzo hit him with the metal pole. Figueroa did not remember hitting Dunlap.

*Rebuttal Evidence*

1. *Character Evidence Regarding Dunlap*

Reverend Dudley Chatman testified that Dunlap had been involved in his church since he was a youth and had always gotten along well with people at the church. Dunlap was 22 or 23 years old when he died. After Dunlap's death, Reverend Chatman heard that Dunlap had had some difficulty with a police officer, but Reverend Chatman attributed that to the police force's bias and lack of credibility in the community.

2. *Summer 2011 Skateboard Incident*

Brett Allen testified that on June 28, 2011, around 5:00 p.m., Corzo ran up to him in the middle of the street, kicked him, punched him, and took his skateboard and hit him with it. Allen did not remember Figueroa attacking him, but a witness saw both Corzo and Figueroa attack Allen. The witness testified that he chased Figueroa and wanted to detain him for the police, but Figueroa told him his gang would kill him. Corzo and Figueroa were arrested for the attack. Corzo told police that he took Allen's skateboard and hit him with it because he hated white people.

3. *Estrada's Police Interview*

Estrada told Detective Nuttall that prior to the incident, Dunlap and Figueroa were drinking and appeared to be getting along. However, when Estrada and Corzo returned from the restroom, Figueroa told them Dunlap tried to hit him. Dunlap was drunk and staggering, but he did not have any weapons. Figueroa was holding what appeared to be a stick. When Corzo tried to talk to Dunlap, Dunlap swung at him, so Corzo tackled him to the ground and held him down, and appellants began hitting him and kicking him.

8

# DISCUSSION

I.    *Wheeler/Batson*

During jury selection, the prosecutor used peremptory challenges to excuse three Hispanic jurors, Juror Nos. 4, 22, and 36.[5] Following the challenge to Juror No. 4, defense counsel for Figueroa made a *Wheeler/Batson* motion. The trial court found a prima facie case and asked the prosecutor's reasons for excusing those jurors. After hearing the prosecutor's explanations and defense counsel's arguments, the trial court found that the prosecutor's reasons were race-neutral, justifiable reasons. The court therefore denied the *Wheeler/Batson* motion. Figueroa contends that the trial court erred in denying his motion. We disagree.

The test for analyzing *Wheeler/Batson* claims is well-established. "'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] . . . [¶] 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] ". . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort

---

[5]    On appeal, Figueroa challenges only the excusal of Juror Nos. 4 and 22.

to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" [Citation.]' [Citation.]"**6** (*People v. Taylor* (2009) 47 Cal.4th 850, 885-886 (*Taylor*).)

We discuss each challenged juror in turn. "As part of our analysis, we consider as 'bearing on the trial court's factual finding regarding discriminatory intent' [citation] the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs . . . . At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved." (*Taylor*, *supra*, 47 Cal.4th at p. 887.)

### A.    *Juror No. 4*

Juror No. 4 worked at a retail store and lived with her parents and her brother. She had no prior jury experience, stating that "I would feel a little bit weird doing it because it's a lot of responsibility; but . . . I'm willing to take that chance." When asked about the burden of proof, she stated that she thought "the playing field should be even," but she could follow the law and apply the beyond-

---

**6**    The trial court here did not make explicit findings regarding the prosecutor's stated reasons for the strikes. However, "[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility." (*People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26; see also *People v. Williams* (2013) 56 Cal.4th 630, 653 ["'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. . . .' [Citation.]"].)

a-reasonable-doubt standard. When asked to explain what she meant by "weird," she stated that she was "just nervous."

The prosecutor explained that he excused Juror No. 4 because she was young, lived with her parents, and "used weird to describe the burden of proof and seemed . . . tentative about that." He was planning to keep her on the jury until he saw older, "more seasoned" people whom he preferred to have on the jury.

The prosecutor offered "'permissible race-neutral justifications'" for excusing Juror No. 4: her youth and her expression of disagreement with the burden of proof. (*People v. Montes* (2014) 58 Cal.4th 809, 847.) The burden thus shifted to Figueroa to prove purposeful racial discrimination. (*Ibid.*) "'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 75 (*Manibusan*).)

Figueroa contends that the prosecutor's reasons were not race-neutral because there was no evidence of Juror No. 4's age, and because her response regarding the burden of proof actually indicated that she would have favored the prosecution, not the defense. Figueroa's arguments do not satisfy his burden to prove purposeful racial discrimination. (See *Manibusan*, *supra*, 58 Cal.4th at p. 75.)

The lack of evidence regarding Juror No. 4's exact age is irrelevant. The prosecutor was able to see her and assess her age and maturity level for himself. (See *People v. Lomax* (2010) 49 Cal.4th 530, 575 ["A potential juror's youth and *apparent* immaturity are race-neutral reasons that can support a peremptory challenge. [Citation.]"], italics added; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328 ["Limited life experience is a race-neutral explanation."].) The fact that there were other prospective jurors with no prior jury service does not

11

establish purposeful racial discrimination in the prosecutor's excusal of Juror No. 4.

Whether Juror No. 4's expression of discomfort with the burden of proof favored the prosecution or the defense is similarly irrelevant. The prosecutor's stated justification that Juror No. 4 seemed tentative about applying the proper burden of proof is a race-neutral justification. (See *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386 ["[S]kepticism about the fairness of the criminal justice system is a valid ground for excusing jurors. [Citations.]"]

B.    *Juror No. 22*

Juror No. 22 lived with her two parents and two brothers and had no prior jury experience. She had two uncles and a grandfather who had been charged with or convicted of domestic violence, robbery, and possession of weapons, both recently and in the past. The prosecutor explained that he excused her because her experience of having multiple family members recently accused of these crimes could affect her sympathy for the defendants.

Figueroa points out that the prosecutor did not challenge two other jurors who had family members with experience in the criminal justice system. Juror No. 16 had a brother who had been convicted of armed robbery 10 years earlier. Juror No. 17 had a son who had been charged with a DUI several months earlier.

When discussing these jurors in the trial court, the prosecutor explained that Juror No. 16 was older than Juror No. 22 and that Juror No. 16's brother had "served time . . . a long time ago." As to Juror No. 17, the prosecutor stated that her son's charge was only a misdemeanor DUI.

A comparison of Juror No. 22 with Juror Nos. 16 and 17 reveals substantial differences among them. Juror No. 22 had three family members who faced very

12

serious charges, and her experience was recent.  By contrast, Juror No. 16's brother's experience was 10 years old, and Juror No. 17's son faced only a DUI charge.  Substantial evidence supports the trial court's finding that the prosecutor's justifications for the excusals were not race based.

II.    *Admission of Kelley's Preliminary Hearing Testimony*

Figueroa challenges the trial court's finding that Kelley was unavailable at trial and the resultant admission of Kelley's preliminary hearing testimony. Figueroa argues that the trial court erred in finding that the prosecution exercised reasonable diligence in attempting to locate Kelley.  The record demonstrates to the contrary.

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. [Citations.]  . . .  [¶]  Although important, the constitutional right of confrontation is not absolute.  [Citations.]  'Traditionally, there has been "an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . ." [Citation.]'  [Citation.]  Pursuant to this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's confrontation right.  [Citation.]" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).)

This exception is codified in California Evidence Code section 1291, subdivision (a)(2), which provides that "'former testimony,' such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if 'the declarant is unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given

13

and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'" (*Herrera*, *supra*, 49 Cal.4th at p. 621, fn. omitted.)

Under Evidence Code section 240, subdivision (a)(5), "a witness is unavailable when he or she is '[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process.' (Italics added.) The term '[r]easonable diligence, often called "due diligence" in case law, '"connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character."'" [Citation.] Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*Herrera*, *supra*, 49 Cal.4th at p. 622.)

"[T]he burden is on the government to prove it has exercised good faith and due diligence in attempting to secure a witness's attendance for trial. [Citation.] On review of this issue, we must defer to the trial court's factual findings that are supported by substantial evidence, but we 'independently review whether the facts demonstrate prosecutorial good faith and due diligence.' [Citation.]" (*People v. Roldan* (2012) 205 Cal.App.4th 969, 980.)

Detective James Nuttall testified at an Evidence Code section 402 hearing. He stated that Kelley was cooperative when Detective Nuttall served him with a subpoena prior to the preliminary hearing. Detective Nuttall maintained monthly telephone contact with Kelley after the preliminary hearing. However, Kelley worked in the trucking business and moved to Florida approximately six months before trial. After Kelley moved, he told Detective Nuttall he was destitute and had lost his home and his business. Detective Nuttall told him the prosecutor

14

would make travel arrangements to fly him out for trial. The trial was continued several times, and each time Detective Nuttall spoke with Kelley to remind him he was under subpoena to appear. Kelley would not give Detective Nuttall a new address, and Detective Nuttall assumed this was because he was homeless. Detective Nuttall attempted to contact the Department of Motor Vehicles to obtain a pink slip so that Kelley could sell his truck to raise money to come to California, but to no avail.

Detective Nuttall spoke to Kelley by telephone a week before the Evidence Code section 402 hearing and learned that he was in Michigan. However, a few days before the hearing, Detective Nuttall's calls to Kelley went to voicemail and were not returned. Detective Nuttall went to Kelley's last known address in California, but the building manager did not have a forwarding address, explaining that she was attempting to find Kelley because he owed $2000 in lease payments. Detective Nuttall did not contact Michigan law enforcement to try to find Kelley. He further testified that the police department would attempt to track someone's cell phone if "live suspects or missing persons" were involved, but not in this situation.

The trial court found that the prosecution took reasonable steps to obtain Kelley's presence at trial by, inter alia, talking to him, trying to convince him to be available, and checking with his previous landlord. The court therefore declared Kelley unavailable as a witness.

In challenging the court's ruling, Figueroa relies on *People v. Cogswell* (2010) 48 Cal.4th 467 (*Cogswell*) as an example of what constitutes due diligence. The witness who did not appear in *Cogswell* was the sexual assault victim of the charge for which defendant was on trial. She came to California from her Colorado home to testify at his preliminary hearing but refused to return for trial.

15

The prosecution relied on the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases to issue a subpoena, round trip airplane ticket, and a daily allowance, but it declined to ask that the witness be taken into custody and brought to California for the trial. The California Supreme Court reversed the Court of Appeal's holding that by failing to have the witness taken into custody, the prosecution did not use reasonable diligence in obtaining her presence. (*Id.* at pp. 471, 479.) The Supreme Court reasoned that taking the witness into custody was a drastic measure that was unlikely to result in her becoming a cooperative witness. (*Id.* at pp. 477-479.)

The decision in *Cogswell* does not suggest that efforts less vigorous than those employed in that case cannot constitute due diligence. To the contrary, "'[t]rial courts "do not have to take extreme actions before making a finding of unavailability."' [Citation.]" (*Cogswell*, *supra*, 48 Cal.4th at p. 479.)

The record here establishes that the prosecution exercised reasonable diligence in attempting to procure Kelley's attendance at trial. Detective Nuttall maintained regular telephone contact with Kelley through several trial continuances and through Kelley's moves from California to Florida and Michigan. He attempted to help Kelley improve his financial situation by helping him obtain a pink slip to sell his truck, and he offered to make travel arrangements to fly him out for trial. Detective Nuttall kept Kelley apprised of the trial dates and reminded him of his obligation to appear, and when he lost contact with Kelley, he went to his former address to speak with the landlord. Detective Nuttall's testimony indicate that he exercised ""'persevering application, untiring efforts in good earnest, [and] efforts of a substantial character"''" in attempting to obtain Kelley's presence at trial. (*Herrera, supra*, 49 Cal.4th at p. 622.)

16

The reasonableness of the prosecution's efforts is supported by the circumstance that Kelley's testimony was not of critical importance at trial. (*People v. Fuiava* (2012) 53 Cal.4th 622, 676.) Kelley's testimony that he saw appellants beating Dunlap was supported by the testimony of both Uloth and Fry, who also were eyewitnesses to the attack on Dunlap. Figueroa contends that Kelley was the only witness who unequivocally stated that Figueroa used the crowbar to attack Dunlap, but that is incorrect. Fry testified that both appellants used the crowbar to strike Dunlap in the head. Kelley's testimony accordingly was not critical to the prosecution's case.

Based on Detective Nuttall's testimony, we conclude that the trial court correctly found that the prosecution exercised reasonable diligence in attempting to procure Kelley's attendance at trial.

III.    *Jury Instruction on Voluntary Intoxication*

Figueroa and Corzo both challenge the jury instruction on voluntary intoxication. The trial court instructed the jury pursuant to CALCRIM No. 625 as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

17

Appellants contend that the instruction erroneously prevented the jury from considering evidence of their intoxication as it relates to a finding of express malice. They acknowledge that this contention was not raised in the trial court.

"'Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court.' [Citation.]" (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.) However, where a defendant claims that "the instruction is *not* correct in law, and that it violated his federal constitutional rights, [the] claim need not be preserved by objection before an appellate court can address the issue." (*Ibid*.) "Strong policy reasons support [the forfeiture] rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.]" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Appellants contend that their claim is cognizable on appeal because the jury instruction affected their right to have the jury consider all the evidence related to their defenses. They do not, however, contend that the instruction was erroneous as a matter of law. Appellants therefore have forfeited their challenge to the jury instruction. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [trial court has no duty to instruct sua sponte on voluntary intoxication; duty is on defendant to request an instruction relating the evidence of his intoxication to an element of the crime, such as premeditation and deliberation].) Even if not forfeited, their claim is not meritorious.

"We review de novo whether a jury instruction correctly states the law. [Citations.] Our task is to determine whether the trial court '"fully and fairly instructed on the applicable law." [Citation.]' [Citation.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 720 (*Franco*).)

18

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) First degree murder is a "willful, deliberate, and premeditated killing." (§ 189.) "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*, but without the additional elements – i.e., willfulness, premeditation, and deliberation – that would support a conviction of first degree murder. [Citations.]" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) "California law . . . recognizes three theories of *second degree* murder." (*People v. Swain* (1996) 12 Cal.4th 593, 601.) These are unpremeditated murder with express malice, implied malice murder, and second degree felony murder. (*Ibid.*)

Malice aforethought ""'"is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." [Citation.] . . .' [Citation.]" (*People v. Sanchez* (2013) 221 Cal.App.4th 1012, 1027-1028 (*Sanchez*).)

"Implied malice may be proven by circumstantial evidence and has both a physical and mental component. [Citation.] The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life. [Citation.] The mental component is established where the defendant knows that his conduct endangers the life of another and acts with conscious disregard for life. [Citation.]" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1425 (*McNally*).)

"Voluntary manslaughter is 'the unlawful killing of a human being without malice' 'upon a sudden quarrel or heat of passion.' (§ 192, subd. (a).) An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to

cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]' [Citation.] 'The provocation must be such that an average, *sober* person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813, italics added (*Thomas*).)

Appellants contend that the jury was improperly precluded from considering evidence of their voluntary intoxication as to their theories of heat of passion and imperfect self-defense, thus precluding the jury from finding them guilty of voluntary manslaughter instead of second degree murder. They cite section 29.4, subdivision (b), which provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."

Appellants rely on *People v. Cameron* (1994) 30 Cal.App.4th 591, in which the defendant was charged with second degree murder with implied malice. (*Id.* at p. 599.) The appellate court held that the trial court erred in giving a voluntary intoxication instruction that implied that voluntary intoxication could not negate implied malice. (*Id.* at pp. 599-600.) *Cameron* does not help appellants for several reasons.

First, former section 22, the predecessor to section 29.4, was amended in 1995, after the decision in *Cameron*. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1374 (*Turk*).) As pertinent here, the amendment made voluntary intoxication inadmissible to negate implied malice where the defendant is charged with murder. (*Id.* at p. 1375.) Subsequent to this amendment, courts consistently have held that "[v]oluntary intoxication does not negate implied malice."

20

(*McNally, supra*, 236 Cal.App.4th at pp. 1431-1432; *Turk, supra*, 164 Cal.App.4th at p. 1375; *People v. Timms* (2007) 151 Cal.App.4th 1292, 1298; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114-1115.) *Cameron*'s holding thus has been abrogated.

Second, evidence of voluntary intoxication is not relevant to the objective requirement of adequate provocation which reduces murder to voluntary manslaughter. (See *People v. Lee* (1999) 20 Cal.4th 47, 60 (*Lee*) ["The test of adequate provocation is an objective one."].) Instead, "'[t]he provocation must be such that an average, *sober* person would be so inflamed that he or she would lose reason and judgment. . . .' [Citation.]" (*Thomas*, *supra*, 53 Cal.4th at p. 813, italics added.)

Third, even if the instruction did not explicitly state that evidence of voluntary intoxication may be considered in deciding whether the defendant acted with express malice, the jury was adequately instructed that it could do so. The trial court instructed the jury that "[t]he defendant acted with express malice if he unlawfully intended to kill." The court further instructed the jury that it could consider evidence of voluntary intoxication in deciding whether the defendant acted with an intent to kill. "[T]he California Supreme Court has repeatedly stated that intent to kill and express malice are 'in essence' the same concept. [Citations.]" (*Turk, supra*, 164 Cal.App.4th at p. 1382.) Thus, the instructions "adequately informed the jury that it could consider evidence of [appellants'] voluntary intoxication on the issue of express malice." (*Id.* at p. 1383.) The trial court therefore "'"fully and fairly instructed on the applicable law." [Citation.]' [Citation.]" (*Franco*, *supra*, 180 Cal.App.4th at p. 720.)

Finally, even if the instruction was erroneous, it is not reasonably probable appellants would have obtained a more favorable outcome absent the error.

21

(*People v. Breverman* (1998) 19 Cal.4th 142, 178.) There was considerable evidence that appellants acted with malice. In addition, there was scant evidence either that appellants were so intoxicated as to negate the element of malice or that Dunlap "did or said anything sufficiently provocative that [his] conduct would cause an average person to react with deadly passion. Nor was there direct evidence that [appellants] acted under the influence of such passion." (*Lee*, *supra*, 20 Cal.4th at p. 59.)

According to the eyewitness testimony of Kelley, Uloth, and Fry, both appellants brutally kicked, punched, and attacked Dunlap with a crowbar in the head and chest, even after Dunlap had fallen to the ground and was trying to protect himself. Corzo testified that he hit Dunlap in the head 10 times with a heavy pipe, even after Dunlap was lying on the ground not moving. Corzo also told Officer Lopez that he was punching Dunlap and hitting him with a pipe, adding, "I hope I killed that black piece of shit." Kicking, punching, and hitting someone in the head with a crowbar certainly are actions whose natural consequences are dangerous to life. (*McNally*, *supra*, 236 Cal.App.4th at p. 1425.) The undisputed testimony regarding appellants' actions supports a finding that appellants acted with conscious disregard for life. (*Ibid.*)

There is little evidence that appellants were so intoxicated that they were unable to act with the implied malice required to sustain their convictions for second degree murder. (See *McNally*, *supra*, 236 Cal.App.4th at p. 1424.) Corzo argues that the evidence of his intoxication was undisputed, pointing out that every officer who contacted him smelled alcohol on his breath. However, Officer Lopez testified that, although he smelled alcohol on Corzo's breath, Corzo "spoke clearly and he stood straight." Officer Corona similarly testified that, although he smelled alcohol on Corzo's breath, Corzo did not appear to be drunk or impaired.

22

Detective Nuttall testified that when he interviewed Figueroa, Figueroa appeared to have been drinking, but he was coherent. Estrada stated during her police interview that prior to the assault, Figueroa was not drunk and that she and Corzo were "barely even drinking."

Corzo cites his own testimony that he and Figueroa consumed two 18-packs of beer in 30 minutes and "some 40-ouncers." But Corzo's testimony is belied by his statement during his police interview that he had not drunk very much that day, stating, "I'm not that drunk. I can tell you straight up right now."

Finally, there was very little evidence to support a claim of imperfect self-defense. Contrary to the self-serving testimony of both appellants, Dunlap had no abrasions on his hands that would have indicated that he struck someone, and Corzo and Figueroa had no visible injuries, other than swelling on Corzo's hands. Estrada told Detective Nuttall that Dunlap did not have any weapons. Even if Dunlap had instigated the fight, the testimony of Kelley, Uloth, and Fry was that appellants kicked, punched, and hit Dunlap with a crowbar repeatedly after Dunlap was disoriented and on the ground trying to protect himself. Accordingly, appellants did not suffer prejudice from any alleged instructional error.

IV. *Ineffective Assistance of Counsel*

Corzo contends that his trial counsel's failure to challenge the voluntary intoxication jury instruction constituted ineffective assistance of counsel.

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in

the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 206-207.) "Further, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' [Citation.]" (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

As discussed above, there was no error in the jury instruction. Moreover, as we also discussed above, it is not reasonably probable that but for the alleged error, a more favorable determination would have resulted. Corzo thus has failed to show his counsel acted unreasonably and has failed to demonstrate prejudice.

V.     *Sufficiency of the Evidence to Support Corzo's Conviction*

Corzo contends the evidence is insufficient to support his conviction for second degree murder. We disagree.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment

to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'  [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

Corzo contends that "the uncontroverted evidence" shows he killed Dunlap during a sudden quarrel or heat of passion, or under the unreasonable belief in the need to defend himself.  We need not reiterate the evidence discussed above, which showed that Corzo was not objectively provoked and that his brutal beating of Dunlap constituted a "conscious disregard for life.  [Citation.]" (*McNally*, *supra*, 236 Cal.App.4th at p. 1425.)  In short, Corzo's conviction for second degree murder is supported by substantial evidence.

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.